**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BLAKE ROGERS, *et al.*, | ) | CIVIL ACTION NO. 1:20-CV-02568 |
| | ) | |
| Plaintiffs, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | **SECOND AMENDED AND** |
| | ) | **SUPPLEMENTAL COMPLAINT** |
| MARTIN HORWITZ, *et al.*, | ) | |
| | ) | **JURY DEMAND ENDORSED** |
| Defendants. | ) | **HEREON** |
| | ) | |

Plaintiffs Blake and Jacalyn Rogers, through undersigned counsel, hereby bring their Second Amended and Supplemental Complaint, against all named Defendants, in accordance with Fed. R. Civ. P. 15(d) and order of the Court. (ECF No. 32, PageID # 621–27.) Plaintiffs state and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Blake Rogers worked for Defendant City of Beachwood as a police officer. Plaintiff Blake Rogers had been a Beachwood patrol officer since June 17, 2013. Plaintiff Blake Rogers was recently terminated from his employment with Defendant City of Beachwood on February 22, 2021. Defendants have repeatedly violated Plaintiff Blake Rogers's state and federal rights.

2. Plaintiff Jacalyn Rogers is married to Plaintiff Blake Rogers.

3. All Defendants acted maliciously, in bad faith, wantonly and/or recklessly. All Defendants acted under the color of law.

4.      Defendant Martin Horwitz is the Mayor and Safety Director for Defendant City of Beachwood. Defendant Martin Horwitz is an attorney duly licensed to practice law in the State of Ohio. At all times relevant to this action, Defendant Martin Horwitz was acting within the course and scope of his employment.

5.      Defendant Gary Haba was the Chief of Police for Defendant City of Beachwood. He suddenly left his post in July 2020. At this time, it is unclear whether Defendant Gary Haba left voluntarily or involuntarily. He was Chief for a little over three years. At all times relevant to this action, Defendant Gary Haba was acting within the course and scope of his employment.

6.      Defendant Diane Calta is the Law Director for Defendant City of Beachwood. Defendant Diane Calta recently indicated her intent to step down as Law Director for Defendant City of Beachwood and enter into private practice. Defendant Diane Calta made this announcement on the same day that Plaintiff Blake Rogers was terminated from his employment with Defendant City of Beachwood. Defendant Diane Calta is an attorney duly licensed to practice law in the State of Ohio. At all times relevant to this action, Defendant Diane Calta was acting within the course and scope of her employment.

7.      Defendant Nathalie Supler is the Assistant Law Director for Defendant City of Beachwood. Defendant Nathalie Supler is an attorney duly licensed to practice law in the State of Ohio. At all times relevant to this action, Defendant Nathalie Supler was acting within the course and scope of her employment.

8.     Defendant James Pasch is the President of Beachwood City Council. Defendant James Pasch is an attorney duly licensed to practice law in the State of Ohio. At all times relevant to this action, Defendant James Pasch was acting within the course and scope of his employment.

9.     Defendant City of Beachwood is a municipality and employer in Cuyahoga County, OH. Defendant City of Beachwood is vicariously liable for the conduct of its agents, employees and officials pursuant to the doctrine of respondeat superior.

10.    The Court has jurisdiction to hear this action because the Court has original jurisdiction over all civil actions: arising under the Constitution, laws, or treaties of the United States, 28 U.S.C. § 1331; and commenced to redress the deprivation, under color of any state law, of any right, privilege, or immunity secured by the Constitution or laws of the United States, 28 U.S.C. § 1343.

11.    The Court has supplemental jurisdiction over the state law claims of Plaintiffs Blake and Jacalyn Rogers because these claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. 28 U.S.C. § 1367.

12.    Venue is proper in the Northern District of Ohio because Plaintiffs Blake and Jacalyn Rogers reside in this judicial district, and a substantial part of the events and omissions giving rise to the claims herein occurred in this judicial district. 28 U.S.C. § 1391.

## STATEMENT OF FACTS

### I.    *Plaintiff Blake Rogers's Qualifications and Professional Background.*

13.    All of the foregoing paragraphs are incorporated as though fully set forth here.

14.    When Plaintiff Rogers was sworn in on June 17, 2013, now-retired Beachwood Chief of Police Mark Sechrist said this of Plaintiff Rogers and three other newly sworn officers: "They're all top notch. They're the cream of the crop and we're happy to have them." Chief Sechrist was absolutely right - even more so when referring to Plaintiff Rogers.

15.    Prior to joining the Beachwood Police Department ("BPD") in June 2013, Plaintiff Rogers honorably served for several years as an officer with the Russell Township Police Department.

16.    There, Plaintiff Rogers received numerous awards, accolades, and commendations because of his department-leading performance and professionalism. He was (and is) particularly skilled in spotting, stopping and arresting drunk drivers.

17.    In 2011, the Cleveland Clinic awarded Plaintiff Rogers with its life saving award, and he received a letter of commendation for rescuing an accident victim from a burning car.

18.    In 2012, Plaintiff Rogers was recognized by the Geauga County Sheriff's Office for his distinguished service in connection with the Chardon High School shooting.

19.    When Plaintiff Rogers resigned on June 5, 2013 to join BPD, the Russell Township Board of Trustees asked their Chief of Police, Chief Timothy Carroll, to draft a

resolution of appreciation to commemorate Plaintiff Rogers's accomplishments and exceptional work.

20. On June 19, 2013, two days after Plaintiff Rogers was sworn in at BPD, the Russell Township Board of Trustees unanimously passed Resolution 2013-22: A Resolution of Recognition and Appreciation to Officer Blake Rogers.

21. This was the level of outstanding performance that Chief Sechrist saw in Plaintiff Rogers - and Plaintiff Rogers has lived up to it and more.

22. In 2014, 2015, 2016, 2017 and 2018, Plaintiff Rogers led BPD in OVI stops and arrests.

23. And in 2014, 2015, 2016 and 2017, the Ohio Chapter of Mothers Against Drunk Driving awarded him with their Award of Excellence.

24. Plaintiff Rogers has devoted himself to protecting and serving the citizens of Beachwood for the past seven years.

25. In addition to honorably serving the Beachwood community, Plaintiff Rogers has dutifully and admirably served his fellow BPD officers in a multitude of critical roles.

26. He has acted as a Driving Instructor, a Field Sobriety Test Instructor, a Stop and Approach Field Instructor, an Active Shooter Response Instructor, and he is a leader on the Mobile Field Force Unit.

27. Then, in 2017, Plaintiff Rogers was elected by his fellow officers to be the Vice President of the Fraternal Order of Police, Beachwood Lodge.

II.     *Plaintiff Blake Rogers is Called a "Snowflake" and Denied Promotions After Lawfully Taking Paternity Leave to Support His Wife and Their Newborn Children.*

28.     In June 2016, Plaintiff Rogers advised BPD of his intent to use FMLA leave for the birth of his first child.

29.     His doctor advised that a period of up to six weeks would be medically sufficient to not only provide care to his recovering wife, but also to ensure proper bonding with his newborn child.

30.     Under the FMLA, Plaintiff Rogers was entitled to take up to twelve weeks of family leave to care for his wife and newborn child.

31.     Plaintiff Rogers voluntarily elected to instead use only three weeks of leave under the FMLA, reserving the remaining time in case his wife or child experienced unexpected medical complications.

32.     After Plaintiff Rogers submitted his request for three weeks of family leave, he immediately received opposition from the Department of Human Resources.

33.     Instead of honoring Plaintiff Rogers's FMLA request, Human Resources stated, without explanation, that Plaintiff Rogers could only have five days of family leave to care for his wife and newborn child.

34.     Plaintiff Rogers responded by reminding Human Resources of their obligations under the Collective Bargaining Agreement with BPD. In particular, Plaintiff Rogers correctly stated that denying him use of family leave in this instance would violate the Collective Bargaining Agreement.

35. Not long thereafter, Human Resources granted him three weeks of leave, but it failed to explain why it illegally sought to restrict his family leave time from twelve weeks to five days.

36. Upon returning from FMLA leave in July 2016, Plaintiff Rogers noticed his superiors were treating him differently.

37. Then-Chief Winebrenner and then-Captains Haba and Korinek looked past him like he didn't exist.

38. Before he took FMLA leave, they talked on a daily basis.

39. After he took FMLA leave, they frequently went out of their way to ignore and ostracize him.

40. Plaintiff Rogers was astounded that Defendant Haba engaged in such petulant, puerile behavior simply because he took time away from work to support his wife and newborn child.

41. In February 2017, Defendant Haba and Lieutenant John Resek changed Plaintiff Roger's monthly schedule rotation because of his FMLA use.

42. When Plaintiff Rogers pressed his superiors on why this unwanted change was made without his input, Defendant Haba responded with the hollow explanation that Plaintiff Rogers was performing "too well" on the night shift and he wanted to "even out the stats between shifts" to keep the other shifts from "looking too bad."

43.  This forced schedule change caused Plaintiff Rogers and his wife significant hardship, as the couple had organized their child rearing and caring schedule around Plaintiff Rogers's schedule.

44.  When Plaintiff Rogers confronted Lieutenant Resek about Defendant Haba's purported explanation, Lieutenant Resek admitted that not only was Defendant Haba's explanation false, but that he had a part in assisting Defendant Haba with forcing the schedule change.

45.  Plaintiff Rogers also received confirmation from Lieutenant Atterbury that Defendant Haba's given explanation was simply not true.

46.  Towards the end of 2017, BPD had seven permanent night shift positions available.

47.  Recognizing this as a great opportunity to get back on night shift and to avoid having to send his kids to daycare, Plaintiff Rogers applied.

48.  Six of his fellow officers also applied, meaning that all seven should have filled the seven open spots.

49.  Further, Plaintiff Rogers maintained the second-highest seniority level of all the applicants, falling just behind Officer Jacqueline Schuld in terms of seniority.

50.  However, when the hiring decisions were announced a few weeks later, Plaintiff Rogers was stunned to see that he did not receive one of the permanent night shift positions.

51.  Instead, another officer with less seniority and who did not even apply for one of the positions received one over Plaintiff Rogers.

52. With no explanation regarding this hiring decision coming from the Department's brass, Plaintiff Rogers asked his immediate supervisors, Lieutenant Kevin Owens and then-Sergeant Lisa Budny, if they were aware of why he was passed over for someone who did not even apply.

53. Owens and Budny were both taken aback by this news from Plaintiff Rogers, as both were totally unaware that Plaintiff Rogers had been denied one of the permanent night shift positions.

54. Lieutenant Owens emailed Defendant Haba on behalf of Plaintiff Rogers seeking an explanation for why Plaintiff Rogers was denied one of the open positions.

55. Not long after Lieutenant Owens sent this clarification email, Defendant Haba ordered Plaintiff Rogers into his office.

56. At this closed-door meeting, Defendant Haba claimed he was the one who decided that Plaintiff Rogers did not deserve one of the permanent night shift positions, and Defendant Haba based his decision on falsehoods and outright lies.

57. Defendant Haba falsely claimed Plaintiff Rogers was "disruptive," that he was a "bad influence" on the Department's younger officers, and that "half the Department" despised him.

58. Plaintiff Rogers was shocked and insulted by Defendant Haba's false statements, especially because Defendant Haba often reported for duty while intoxicated (and made drunken phone calls to emergency dispatchers) and was involved in a highly public extra-marital affair with a subordinate officer (the two exchanged 3,800 calls and text messages over a two-month period).

59.  "Your conduct has damaged the reputation of the Beachwood Police Department and this damage continued after you were formally notified that I would not accept further misconduct in that regard," now-retired Beachwood Chief of Police Mark Sechrist wrote in in a letter reprimanding Defendant Haba. "Your actions after June 11 resulted in insubordination; you did not do what you were directed to do."

60.  Defendant Haba was obviously projecting his own negative attributes onto Plaintiff Rogers—Plaintiff Rogers served as an instructor and role model for his fellow officers, acting as a Driving Instructor, a Field Sobriety Test Instructor, a Stop and Approach Field Instructor, an Active Shooter Response Instructor, and a leader for the Mobile Field Force Unit.

61.  If Defendant Haba viewed Plaintiff Rogers in such a negative light, then why was Plaintiff Rogers educating his fellow officers on critical aspects of policing and developing healthy citizen relationships?

62.  If Plaintiff Rogers was "disruptive" and a "bad influence," then why wasn't he subjected to remedial training, disciplinary action, or placed under heightened supervision?

63.  The answer to these questions is clear: Defendant Haba's pretextual lies and accusations were the direct result of Plaintiff Rogers's lawful, protected use of FMLA leave.

64.  Plaintiff Rogers eventually received one of the permanent night shift positions in March 2018, but not without controversy.

65. Lieutenant Resek repeatedly harassed Officer Jacqueline Schuld to the point where she resigned from BPD.

66. Officer Schuld's resignation created an opening among the permanent night shift positions, and Defendant Haba "miraculously" selected Plaintiff Rogers to fill it.

67. However, prior to doing so, Plaintiff Haba had unsuccessfully attempted to force another, less-senior officer into filling the vacancy to avoid allowing Plaintiff Rogers to fill it.

68. Plaintiff Rogers subsequently took the Civil Service Examination to become a Sergeant.

69. As one of the most motivated, knowledgeable, competent, and professional members of BPD, Plaintiff Rogers was poised to score excellently on the Exam and become a noteworthy addition to the Department's leadership.

70. But Defendant Haba purposely and discriminatorily manipulated the exam scores in order to wrongfully deny Plaintiff Rogers a promotion.

71. Defendant Horwitz knew of Defendant Haba's conduct and rubber stamped it.

72. Plaintiff Rogers scored the highest on the Civil Service Commission Interview and Assessment Center Panel.

73. But because Defendant Haba gave Plaintiff Rogers the lowest number of "Chief's Points," which accounted for 10 percent of the final Exam score, Plaintiff Rogers fell into third place (and there were only two Sergeant's positions to fill).

74. Defendant Haba gave Plaintiff Rogers the lowest amount of "Chief's Points" out of all candidates while awarding the lesser-performing and qualified candidates with higher amounts of "Chief's Points."

75. "Chief's Points" are given for high performance and efficiency.

76. Lieutenant Lisa Budny was awarded "Chief's Points" for attendance.

77. Defendant Haba gave no explanation as to why he awarded the "Chief's Points" as he did, but he did not need to: Defendant Haba awarded the points soon after he found out Plaintiff Rogers was taking FMLA leave to care for his wife and their second child.

78. Soon after Plaintiff Rogers submitted his second request for FMLA leave, Defendant Haba called Plaintiff Rogers a "snowflake" for taking FMLA leave.

79. Defendant Haba said this to a highly respected member of the Shaker Heights Police Department.

80. Defendant Horwitz knew of Defendant Haba's conduct and rubber stamped it.

81. In an affidavit, the Shaker Heights officer deposed: "Haba told me that Blake Rogers should not be taking all 12 weeks of paternity leave and stated Blake Rogers is a "snowflake". Haba insinuated that Rogers was a "snowflake" for taking all 12 weeks of paternity leave. Based on Haba's comments, it was clear to me that Haba did not like Blake Rogers because he took paternity leave."

82. In Defendant Haba's eyes, Plaintiff Rogers is a "snowflake" for taking paternity leave and is therefore undeserving of a promotion.

83.    In Defendant Horwitz's eyes, Plaintiff Rogers is a "snowflake" for taking paternity leave and is therefore undeserving of a promotion.

84.    Plaintiff Rogers was twice passed over for promotion to sergeant because he is a "snowflake".

85.    BPD Lieutenant Lisa Budny wrote, "they [Defendants Horwitz, Beachwood and Haba] used FMLA against me in promotionals and admitted to it."

86.    In 2019, Defendant Haba again engaged in unlawful retaliatory conduct by denying Plaintiff Rogers a specialized position.

87.    In early 2019, BPD created two K-9 Units, one for Bombs and Explosives, and the other for Drugs and Narcotics.

88.    In 2016, Plaintiff Rogers and Officer Acker drafted the reports and submitted the proposals which directly lead to the creation of the Department's K-9 Unit.

89.    Prior to Plaintiff Rogers's efforts, BPD did not have a K-9 Unit of its own.

90.    Because he was responsible for the K-9 Unit's creation, Plaintiff Rogers applied for the K-9 Unit openings and reasonably believed he would be selected to fill one of the two positions.

91.    During the K-9 Unit interview process, however, the focus was not on qualifications, temperament, or prior relevant experience.

92.    Instead, the interviewers interrogated Plaintiff Rogers over his use of FMLA leave and they even asked him why he took "so much" FMLA leave when other officers do not.

93.  Thus, instead of assessing Plaintiff Rogers on the merits of his ability to be an effective K-9 handler, the interviewers - all of whom were chosen by Defendant Haba - chose to unlawfully criticize and penalize Plaintiff Rogers for lawfully using paternity leave.

94.  Two other officers with less experience were chosen over Plaintiff Rogers to become BPD's K-9 handlers.

### III.  Plaintiff Blake Rogers Experiences Disparate Treatment After Using Justifiable, Necessary, and Lawful Force Against Fleeing Felon Jaquan Jones.

95.  On June 27, 2019, Plaintiff Rogers was dispatched to Beachwood Place to investigate suspected shoplifting.

96.  Plaintiff Rogers would not have been at Beachwood Place on June 27, 2019 had he been promoted.

97.  As Plaintiff Rogers approached the scene, he saw the then-suspect and now convicted-felon Jaquan Jones running from Saks Fifth Avenue to the adjacent parking lot.

98.  Plaintiff Rogers dutifully followed in his cruiser.

99.  Upon seeing Jaquan Jones begin to enter a vehicle, Plaintiff Rogers got out of his cruiser and immediately commanded Jones to stop and put his hands up.

100.  Plaintiff Rogers was aware Jaquan Jones likely possessed a loaded handgun because he was furtively reaching toward the floorboard of the vehicle.

101.  Jaquan Jones refused to comply with Plaintiff Rogers's orders (he pled Guilty to Failure to Comply with an Order or Signal of a Police Officer, a felony of the third

degree) and instead ran the stolen vehicle he was driving over Plaintiff Rogers's left foot and ankle, which caused him to suffer immediate and great bodily injury.

102. Consequently, Plaintiff Rogers shot at Jaquan Jones, an admitted heroin trafficker who also pled Guilty to Involuntary Manslaughter, a felony of the first degree, for selling a deadly dose of heroin.

103. Jaquan Jones sped away in the stolen vehicle after being struck.

104. A lengthy high-speed chase ensued, and Jaquan Jones eventually ditched the stolen vehicle and loaded handgun and fled by foot, remaining at-large.

105. A month later, Jaquan Jones was apprehended in Cleveland - but not before he rammed four Cleveland Police cruisers - after selling heroin to an undercover officer.

106. Following the June 27, 2019, incident at Beachwood Place, Defendant Horwitz immediately placed Plaintiff Rogers on indefinite administrative leave.

107. Defendant Horwitz, who has a remarkable history of engaging in discriminatory conduct since becoming mayor in January 2018, has discriminatorily kept Plaintiff Rogers on leave ever since the shooting, notwithstanding Jaquan Jones' Plea of Guilty to Attempted Felonious Assault, a felony of the third degree, for running over Plaintiff Rogers's left foot and ankle.

108. Because Jaquan Jones admitted to "attempting" to run Plaintiff Rogers over with a vehicle, a deadly weapon, Plaintiff Rogers had justification to respond in kind with a deadly weapon.

109. It is undisputed that Jaquan Jones actually did run Plaintiff Rogers over.

15

110.   Jaquan Jones was indicted for Felonious Assault of a Peace Officer and, as a plea deal, pled to the lesser-included charge of Attempted Felonious Assault.

111.   In March 2019, Beachwood police officer Terrill Rodgers shot at a vehicle as it was driving away from him.

112.   Defendant Horwitz did not place Terrill Rodgers, an uninjured African American, on indefinite administrative leave following the shooting.

113.   In March 2019, Beachwood police officer Dana Gollner shot an unarmed suspect.

114.   Defendant Horwitz did not place Dana Gollner, an uninjured African American, on indefinite administrative leave following the shooting.


IV.   *Plaintiff Blake Rogers Experiences Worker's Compensation Retaliation and Disability Discrimination.*

115.   On or about June 27, 2019, Plaintiff Rogers filed worker's compensation claims.

116.   The Ohio Bureau of Worker's Compensation determined Plaintiff Rogers to have permanent partial disability due to being run over in the line of duty.

117.   An MRI revealed Plaintiff Rogers suffered "peroneous longus tendinosis possibly with a degree of mild interstitial tearing as it courses beneath the cuboid. Additionally, there is a focal split tear of the peroneous longus tendon at its 1st metatarsal insertion. Mild 1st through 3rd intermetatarsal bursitis."

118.   Plaintiff Rogers also suffers from PTSD as a result of the June 27, 2019 incident with Jaquan Jones.

119.   Plaintiff Rogers has been kept on indefinite administrative leave because he filed for worker's compensation.

16

120. Plaintiff Rogers needs surgery to repair ligaments in his foot and ankle.

121. For over a year, Defendants Horwitz and Beachwood have been actively preventing Plaintiff Rogers from getting the surgery and treatment he needs.

122. For over a year, Defendants Horwitz and Beachwood have wrongfully interfered with Plaintiff Rogers' rights under Ohio Worker's Compensation laws.

123. Defendant Horwitz was a worker's compensation lawyer before becoming mayor.

124. Defendants Horwitz and Beachwood do not interfere with other police offers' worker's compensation claims.

125. BPD patrol officer Monica Slapak injured her knee while running through Acacia Creek.

126. BPD patrol officer Monica Slapak immediately received worker's compensation benefits.

127. BPD patrol officer Monica Slapak stated, "they [Defendants Horwitz and Beachwood] covered it with no hassle".

128. Plaintiff Rogers received no reasonable accommodations following his diagnoses.

129. Plaintiff Rogers is, and has been, ready, willing and able to perform light-duty work for BPD (administrative, detective, evidence, dispatch, etc.), but BPD has wrongfully refused to accommodate and reinstate him.

130. Defendant Horwitz has the sole power and authority to reinstate Plaintiff Rogers.

131. Upon heroically becoming disabled in the line of duty, Plaintiff Rogers should have been celebrated and accommodated.

132. Instead, Plaintiff Rogers has been shunned and discriminated against.

133.  BPD patrol officer Luke Combs cut his leg in chainsaw accident and BPD gave him light duty work.

134.  BPD patrol officer Monica Slapak is pregnant, and BPD gave her light duty work in dispatch.

## V.  *Defendant Pasch Makes Stigmatizing Comments About Plaintiff Blake Rogers.*

135.  Regarding the shooting of Jaquan Jones, Defendant Pasch stated, "the incident is horrible and was avoidable."

136.  Regarding the shooting of Jaquan Jones, Defendant Pasch stated, "In my opinion, the use of unjust deadly force cannot result in a second chance."

137.  Defendant Pasch publicly disclosed his above statements.

138.  Defendant Pasch's statements caused Plaintiff Rogers to suffer a tangible loss of employment opportunities.

139.  For example, Plaintiff Rogers applied for a similar job and the employer stated: "I am in receipt of your application to work with my company. Under normal circumstances this would be a no-brainer. Your knowledge, work ethic, experience and personality would make you a viable member of my company. With that established, unfortunately, at this time your application is being held in abeyance. It truly pains me to watch your situation in Beachwood continue to unfold. In over 40 years of law enforcement, I have never seen a municipal government mismanage an internal investigation as they have. To add insult to injury- inept, ignorant and uninformed emotional comments made by Council President James

Pasch and resident Mallory McMaster didn't accomplish anything but fuel the current volatile situation."

### VI.  *Defendants Horwitz, Haba, Calta, Supler, and Beachwood Conspire to Maliciously Prosecute Plaintiff Rogers and Abuse Process.*

140.  Defendants Horwitz, Haba, Calta, Supler and Beachwood repeatedly and maliciously requested that Plaintiff Rogers be criminally prosecuted for justifiably shooting Jaquan Jones.

141.  Defendants' requests were repeatedly rebuffed.

142.  Notwithstanding, Defendants continued on their mission to get Plaintiff Rogers criminally prosecuted for justifiably shooting Jaquan Jones.

143.  Law enforcement officials from Ohio BCI, the Ohio Attorney General's Office, and the Cuyahoga County Prosecutor's Office advised Defendants that Plaintiff Rogers cannot be criminally prosecuted for shooting Jaquan Jones.

144.  Defendants maliciously refused to accept that conclusion.

145.  Defendants knew Jaquan Jones had been indicted by a Cuyahoga County Grand Jury for Felonious Assault of a Peace Officer due to running over Plaintiff Rogers.

146.  Defendants finally coerced what they were asking for and, on October 9, 2020, the case was presented to a Cuyahoga County Grand Jury.

147.  The same day the case was presented, the Cuyahoga County Grand Jury returned a No Bill and discharged Plaintiff Rogers for shooting Jaquan Jones.

148.    The criminal proceeding Defendants maliciously instituted and continued was terminated in favor of Plaintiff Rogers because the Grand Jury declined to indict him.

149.    Defendants set the Grand Jury in motion for a purpose in which it was not designed: To get just cause to terminate Plaintiff Rogers from BPD.

150.    Defendants do not accept the finding of the Grand Jury.

151.    Defendants are now conducting their own investigation into the shooting of Jaquan Jones.

152.    Defendants' internal investigation is being conducted to try and find just cause to terminate Plaintiff Rogers from BPD.

153.    Under the CBA, Plaintiff Rogers can only be terminated for "just cause."

154.    The Grand Jury did not provide Defendants with just cause to terminate Plaintiff Rogers from BPD.

155.    Jaquan Jones' Pleas of Guilty did not provide Defendants with "just cause" to terminate Plaintiff Rogers from BPD.

156.    On October 10, 2020, Defendant Horwitz stated the following to Channel 19 News regarding the internal investigation: "I have instructed Chief Stillman to make this a top priority and I am hopeful we will have his Department's report within the next 14 days."

157.    Defendant Horwitz interviewed candidates for BPD's Chief of Police vacancy in the summer and fall of 2020.

158.    Defendant Horwitz discussed Plaintiff Rogers during the interviews.

159. Defendant Horwitz ultimately chose to hire Chief Kelly Stillman to be BPD's Chief of Police because he received assurance that there is "just cause" for Plaintiff Rogers' termination.

160. Chief Stillman was sworn in on September 21, 2020.

**VII.  *Defendants Beachwood and Horwitz Terminate Plaintiff Rogers' Employment in Retaliation for Bringing This Lawsuit Challenging Their Unlawful and Discriminatory Conduct.***

161. Plaintiffs filed a lawsuit challenging and opposing statutorily prohibited discrimination on October 12, 2020, in the Cuyahoga County Court of Common Pleas. (Doc #: 1-1, PageID #: 4–46.)

162. This state-court complaint alleged, in part, that the Defendants engaged in the following acts of statutorily prohibited discrimination: (1) retaliating against Plaintiff Rogers for having requested and made use of medical leave under the FMLA; (2) discriminating against Plaintiff Rogers on the basis of race in violation of R.C. § 4112.02(A); (3) discriminating against Plaintiff Rogers on the basis of an actual or perceived disability in violation of R.C. § 4112.02(A) and the Americans with Disabilities Act; and (4) interfering with Plaintiff Rogers' liberty interests in obtaining employment in violation of the Fourteenth Amendment to the Constitution.

163. All of the Defendants received a civil summons through the Cuyahoga County Court of Common Pleas which informed them of the Plaintiffs' allegations. (Doc #: 1-2, PageID #: 47–52.)

164. On November 16, 2020, the Defendants removed the Plaintiffs' civil action to federal court. (Doc #: 1, PageID #: 1–3.)

165. As shown through the federal court docket, each of the Defendants have actively participated in this litigation and are cognizant of the Plaintiffs challenging and opposing their statutorily prohibited discrimination. (See, e.g., Doc #: 9, 13, 15, 16, 21, 23, and 26.)

166. However, that did not stop Defendants Horwitz and Beachwood from terminating Plaintiff Rogers' employment in February 2021.

167. Defendants Horwitz and Beachwood conducted an "administrative pre-disciplinary hearing" on February 18, 2021, whereat the issue of Plaintiff Rogers' employment with Defendant Beachwood was discussed.

168. This hearing was framed as Plaintiff Rogers' "opportunity to respond to allegations that [he]" violated some of Defendant Beachwood's policies during the officer-involved shooting at Beachwood Place on June 27, 2019.

169. Defendant Horwitz summarized the February 18, 2021 meeting in a formal termination letter dated February 22, 2021, which is attached hereto and incorporated herein as Plaintiffs' Exhibit 1.

170. In this February 22, 2021 letter, Defendant Horwitz admitted that "the City did not engage in any independent investigation of the June 27, 2019 officer involved shooting," and that this decision to terminate Plaintiff Rogers was purportedly based solely on a memorandum that Chief Stillman wrote after reviewing Defendant Beachwood's policies.

171.   Defendant Horwitz further wrote that "Chief Stillman confirmed the City did not engage in any independent investigation of the June 27, 2019 officer involved shooting," again demonstrating that this alleged memorandum from Chief Stillman was purportedly the motivating force behind the termination.

172.   The pretextual nature of this Chief Stillman memorandum was brought to the forefront when Defendant Horwitz claimed that Plaintiff Rogers was not entitled to Chief Stillman's memorandum or his "thoughts and analysis" because of "the investigatory work product privilege."

173.   However, the "investigatory work product privilege" is actually an evidentiary privilege intended to protect active law enforcement efforts from possible harm arising from public disclosure of criminal investigatory files.

174.   Further, Defendant Horwitz indicated that Plaintiff Rogers' "arguments are contradicted by the video evidence and third-party witnesses," but failed to articulate what this evidence was, what it showed, and how it rebutted any of the arguments Plaintiff Rogers made during the February 18, 2021 proceeding.

175.   Instead, Defendant Horwitz provided the real motive behind the termination in this February 22, 2021 letter: "As there is a current legal action filed by you against the City of Beachwood, there will be no further comments or interviews on behalf of the City."

176.   Defendants Horwitz and Beachwood terminated Plaintiff Rogers' employment to retaliate against him for having filed a civil action against them challenging their discriminatory conduct.

177. Defendants Horwitz and Beachwood had no legitimate basis to terminate Plaintiff Rogers' employment and used this illegitimate pre-disciplinary hearing as pretext to retaliate against Plaintiff Rogers for having filed a civil action against them.

**COUNTS 1–4**
**Retaliation in Violation of**
**The Family and Medical Leave Act of 1993, 29 U.S.C. § 2615(A)(2),**
**Against Defendants Martin Horwitz, Gary Haba, and City of Beachwood**

178. All of the foregoing paragraphs are incorporated as though fully set forth here.

179. Plaintiff Rogers, having worked for Defendants in a full-time capacity and in excess of 1,250 hours over a 12-month period, was an "eligible employee" under Section 2611(2)(A) of the Family and Medical Leave Act.

180. Defendant City of Beachwood qualifies as an employer under Section 2611(4)(A)(i) of the Family and Medical Leave Act because it: (1) engages in commerce or in an industry affecting commerce; and (2) employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

181. Defendants Martin Horwitz and Gary Haba qualify as employers under Section 2611(4)(A)(ii)(I) of the FMLA because each acted, directly or indirectly, in the interests of Defendant City of Beachwood as to any of Beachwood's employees.

182. Under the FMLA, Plaintiff Rogers is entitled to twelve weeks of unpaid, job-protected leave per year.

183.   The FMLA is designed to help employees balance their work and family responsibilities by allowing them to take reasonable unpaid leave for certain family and medical reasons.

184.   Under the FMLA, Plaintiff Rogers is entitled to twelve weeks of leave for the birth and care of his newborn child.

185.   Under the FMLA, Plaintiff Rogers is entitled to twelve weeks of leave to care for his wife following her giving birth.

186.   Plaintiff Rogers engaged in protected activity by providing Defendants with adequate, reasonable, and practicable notice of his intent to utilize an entitlement under the FMLA.

187.   By taking paternity leave, Plaintiff Rogers engaged in protected activity by actually making use of an entitlement under the FMLA.

188.   In an affidavit, a Shaker Heights police officer deposed: "Haba told me that Blake Rogers should not be taking all 12 weeks of paternity leave and stated Blake Rogers is a "snowflake". Haba insinuated that Rogers was a "snowflake" for taking all 12 weeks of paternity leave. Based on Haba's comments, it was clear to me that Haba did not like Blake Rogers because he took paternity leave."

189.   In Defendant Haba's eyes, Plaintiff Rogers is a "snowflake" for taking paternity leave and is therefore undeserving of any promotion.

190.   In Defendant Horwitz's eyes, Plaintiff Rogers is a "snowflake" for taking paternity leave and is therefore undeserving of any promotion.

191.  Defendant Horwitz told an employee that if she ever had children, she would be fired. The individual who reported this allegation took contemporaneous notes regarding the incident.

192.  BPD Lieutenant Lisa Budny stated, in writing, "they [Defendants Horwitz, Beachwood and Haba] used FMLA against me in promotionals and admitted to it."

193.  Defendants knew that Plaintiff Rogers intended to make use of his entitlements under the FMLA and also knew that Plaintiff Rogers actually did make use of those entitlements.

194.  On two occasions, Defendants intentionally chose to not promote Plaintiff Rogers to sergeant because he lawfully took paternity leave.

195.  Two less qualified officers who did not use FMLA leave were chosen over Plaintiff Rogers to become sergeants.

196.  On two occasions, Defendants intentionally chose to not promote Plaintiff Rogers to become a K-9 handler because he lawfully took paternity leave.

197.  Two officers with less experience who did not use FMLA leave were chosen over Plaintiff Rogers to become BPD's K-9 handlers.

198.  Defendants' decisions to not promote Plaintiff Rogers because of his use of protected entitlements was retaliatory, unreasonable, made without good faith, and violated Section 2615(a)(2) of the FMLA.

199. Defendants' unreasonable, bad-faith adverse employment actions against Plaintiff Rogers were directly and proximately connected to Plaintiff Rogers's use of his protected entitlements and violated Section 2615(a)(2) of the FMLA.

200. Plaintiff Rogers has suffered lost wages, salary, pension, retirement, employment benefits, and other compensation as a direct and proximate result of Defendants' adverse employment actions and is therefore entitled to all available remedies under Section 2617(a) of the FMLA, which includes but is not limited to: back pay; liquidated (double) damages; pre- and post-judgment interest; front pay; attorney fees; expert fess (29 U.S.C. § 2617(a)(3)); and any further equitable relief warranted under law.

### COUNTS 5–7
**Disparate Treatment in Violation of R.C. § 4112.01, *et seq.*,**
**Against Defendant City of Beachwood;**
**42 U.S.C. § 1983—Equal Protection Violations, Fourteenth Amendment,**
**Against Defendant Martin Horwitz; and**
**Aiding and Abetting Disparate Treatment in Violation of R.C. § 4112.02(J)**
**Against Defendant Martin Horwitz.**

201. All of the foregoing paragraphs are incorporated as though fully set forth here.

202. As mayor and a duly licensed attorney, Defendant Horwitz has a patterned and planned practice of engaging in unlawful discriminatory conduct in the workplace.

203. Defendant Horwitz sexually harassed Whitney Crook, who is clerk of council and a legal assistant for Defendant City of Beachwood.

204. In 2020, Defendant Horwitz paid Ms. Crook $16,000 to settle her sexual harassment claims.

205. Since he took office in 2018, Defendant City of Beachwood has paid at least $100,485.08 in settlements, attorney fees and other costs over allegations against Defendant Horwitz.

206. The former Acting United States Attorney for the Northern District of Ohio investigated allegations against Defendant Horwitz.

207. She was engaged by Beachwood city council and her findings are as follows:

208. At the workplace, Defendant Horwitz looked down Ms. Crook's shirt.

209. At the workplace, Defendant Horwitz stated to Ms. Crook, "I'm just trying to see how far down that tattoo goes."

210. Thereafter, in July 2019, Defendant Horwitz made a sexually provocative comment to Ms. Crook.

211. Thereafter, Defendant Horwitz told Ms. Crook he wanted to "punish" her (an implied erotic spanking) for making a typographical error.

212. In response, Ms. Crook told Defendant Horwitz that he cannot talk to her that way.

213. Notwithstanding, Defendant Horwitz thereafter inappropriately commented on Ms. Crook's appearance, stating, "What is this look? I like this look."

214. Additionally, on multiple occasions, Defendant Horwitz made inappropriate and demeaning comments about members of city council and the fire department.

215.    When discussing new supervisory responsibilities over a city employee, Defendant Horwitz stated, "Now that I'm supervising you, does that mean I can take you home like chattel? I've never had me a manager before."

216.    In speaking to an employee about a potential promotion for which that individual was not qualified, Defendant Horwitz said, "You are like a virgin to this office. I know you're not a virgin, or maybe you are, or maybe that's none of my business."

217.    Defendant Horwitz admitted that during a meeting attended by several city employees from different departments, he said to a visibly pregnant city employee, "You really let yourself go."

218.    When speaking about two female candidates running for common pleas judge and discussing which he planned to endorse, Defendant Horwitz told an employee that, "This is the first time I've been between two women before, and even though this is a complete fantasy of mine, I don't know who to back."

219.    Defendant Horwitz told an employee that if she ever had children, she would be fired. The individual who reported this allegation took contemporaneous notes regarding the incident.

220.    Defendant Horwitz bragged to someone about being the mayor who "hired the first colored firefighter" in Beachwood.

221.    Defendant Horwitz asked more than once, "You know the TV in the mayor's office? Can I get Netflix on that?" The employee who reported this allegation viewed it as related to a subsequent statement by Defendant Horwitz in which he

stated, "I don't wear pants when I'm home. That makes it easier when you're watching porn."

222. During a meeting, a female city employee made a suggestion and Defendant Horwitz stated, "Wow, you're not only good looking, you're actually smart, too." He then added, "You should come and work in the mayor's office with me."

223. After Defendant Horwitz placed his executive secretary, Deborah Noble, on administrative leave, city council, fearing litigation, approved a settlement for just under $24,000 more than she was owed.

224. Defendant Horwitz engaged in the foregoing pattern of conduct since January 2018.

225. In March 2019, Beachwood police officer Terrill Rodgers shot at a vehicle as it was driving away from him.

226. Defendant Horwitz did not place similarly situated officer Terrill Rodgers, an uninjured African American, on indefinite administrative leave following the shooting.

227. In March 2019, Beachwood police officer Dana Gollner shot an unarmed suspect.

228. Defendant Horwitz did not place similarly situated officer Dana Gollner, an uninjured African American, on indefinite administrative leave following the shooting.

229. On June 27, 2019, Plaintiff Rogers was dispatched to Beachwood Place to investigate suspected shoplifting.

230.    Plaintiff Rogers would not have been at Beachwood Place on June 27, 2019 had he been promoted.

231.    As Plaintiff Rogers approached the scene, he saw then-suspect (and now, convicted felon) Jaquan Jones running from Saks Fifth Avenue to the adjacent parking lot.

232.    Plaintiff Rogers dutifully followed in his cruiser.

233.    Upon seeing Jaquan Jones begin to enter a vehicle, Plaintiff Rogers got out of his cruiser and immediately commanded Jones to stop and put his hands up.

234.    Plaintiff Rogers was aware Jaquan Jones likely possessed a loaded handgun because he was furtively reaching toward the floorboard of the stolen vehicle.

235.    Jaquan Jones refused to comply with Plaintiff Rogers's orders (he pled Guilty to Failure to Comply with an Order or Signal of a Police Officer, a felony of the third degree) and instead ran the stolen vehicle he was driving over Plaintiff Rogers's left foot and ankle, which caused him to suffer immediate and great bodily injury.

236.    Consequently, Plaintiff Rogers shot at Jaquan Jones, an admitted heroin trafficker who also pled Guilty to Involuntary Manslaughter, a felony of the first degree, for selling a deadly dose of heroin.

237.    Jaquan Jones sped away in the stolen vehicle after being struck.

238.    A lengthy high-speed chase ensued, and Jaquan Jones eventually ditched the stolen vehicle and loaded handgun and fled by foot, remaining at-large.

239.   A month later, Jaquan Jones was apprehended in Cleveland—but not before he rammed four Cleveland Police cruisers—after selling heroin to an undercover officer.

240.   Following the June 27, 2019, incident at Beachwood Place, Defendant Horwitz immediately placed Plaintiff Rogers on indefinite administrative leave.

241.   Defendant Horwitz, who has a remarkable history of engaging in discriminatory conduct since becoming mayor in January 2018, has discriminatorily kept Plaintiff Rogers on leave ever since the shooting, notwithstanding Jaquan Jones' Plea of Guilty to Attempted Felonious Assault, a felony of the third degree, for running over Plaintiff Rogers's left foot and ankle.

242.   Because Jaquan Jones admitted to "attempting" to run Plaintiff Rogers over with a vehicle, a deadly weapon, Plaintiff Rogers had justification to respond in kind with a deadly weapon.

243.   It is undisputed that Jaquan Jones actually did run Plaintiff Rogers over.

244.   Jaquan Jones was indicted for Felonious Assault of a Peace Officer and, as a plea deal, pled to the lesser-included charge of Attempted Felonious Assault.

245.   In aiding and abetting Defendant Beachwood's disparate treatment of Plaintiff Rogers, Defendant Horwitz did place Plaintiff Rogers, a Caucasian, on indefinite administrative leave following the shooting.

246.   Defendant Horwitz has the sole authority to place an officer on indefinite administrative leave or not.

247. Now, over fifteen months later, Plaintiff Rogers remains on indefinite administrative leave, an adverse employment action, because he is Caucasian.

248. As a Caucasian, Plaintiff Rogers is in a protected class.

249. Plaintiff Rogers is qualified to be a police officer for the City of Beachwood.

250. Defendant Horwitz treated Rodgers and Gollner better than Plaintiff Rogers because they are African American; Defendants Horwitz and Beachwood treated Rodgers and Gollner differently from Plaintiff Rogers because Plaintiff Rogers is Caucasian.

251. But for Plaintiff Rogers being Caucasian, Defendants Horwitz and Beachwood would not have placed him on indefinite leave; Defendants Horwitz and Beachwood treated African American officers more favorably by not placing them on indefinite leave following their use of force incidents.

252. As a direct and proximate result of Defendant Horwitz's aiding and abetting of Defendant City of Beachwood's disparate treatment, reverse racial discrimination, and violations of the guarantee of Equal Protection pursuant to the Fourteenth Amendment, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

253. Defendant Horwitz's discrimination was willful, wanton, intentional, malicious, reckless and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.

**COUNTS 8–9**
**Disability Discrimination—Americans With Disabilities Act; and**
**Disability Discrimination in Violation of R.C. § 4112.01,** *et seq.,*
**Against Defendants Martin Horwitz, Gary Haba, and City of Beachwood**

254. All of the foregoing paragraphs are incorporated as though fully set forth here.

255. The ADA covers persons who meet the ADA's definition of a "qualified individual with a disability." That term refers to persons having a physical or mental impairment that "substantially limits one or more of the major life activities."

256. Under Ohio and federal law, an employer is required to provide a reasonable accommodation to the known physical or psychological limitations of an employee with a disability.

257. An accommodation is any change in the work environment, or the way things are customarily done that enables an employee with a disability to perform the job and otherwise enjoy equal employment opportunities. 29 C.F.R. App. §1630.2(o).

258. Plaintiff Rogers received no reasonable accommodations following the diagnosis of his lower leg and PTSD disabilities.

259. Plaintiff Rogers is, and has been, ready, willing and able to perform light-duty work for BPD (administrative, detective, evidence, dispatch, etc.), but BPD has wrongfully refused to accommodate and reinstate him.

260. Defendant Horwitz has the sole power and authority to reinstate Plaintiff Rogers.

261. Defendants Horwitz, Haba, and Beachwood could have provided Plaintiff Rogers with a reasonable accommodation, but they discriminatorily chose not to.

262. Upon heroically becoming disabled in the line of duty, Plaintiff Rogers should have been celebrated and accommodated.

263.   Instead, Plaintiff Rogers has been shunned and discriminated against.

264.   BPD patrol officer Luke Combs cut his leg in chainsaw accident and BPD gave him light duty work.

265.   BPD patrol officer Monica Slapak is pregnant, and BPD gave her light duty work in dispatch.

266.   Defendants' placed Plaintiff Rogers on indefinite administrative leave because of his disabilities even though he can perform his job with reasonable accommodations.

267.   Because of the injury to his leg, the Ohio Industrial Commission declared that Plaintiff Rogers has a permanent partial disability.

268.   Because of the injury to his leg, Plaintiff Rogers cannot walk, run, kneel, carry or lift objects, play with or care for his children, or assist or care for his wife; and when he tries to do any of these major life activities, Plaintiff Rogers experiences severe pain.

269.   Plaintiff Rogers has been prescribed several medications to treat the symptoms of his PTSD, which includes hyper-vigilance in public spaces, anxiety (which has caused him to gain around 40–50 pounds since the date of the shooting), sleeplessness, nightmares, agoraphobia, lack of concentration, and decreased libido.

270.   Rather than provide Plaintiff Rogers with a reasonable accommodation, such as light duty work that was offered to other injured officers, Defendants Horwitz, Haba, and Beachwood chose to discriminate against Plaintiff Rogers because of

his disability, and/or because Defendants Horwitz, Haba, and Beachwood perceived Plaintiff Rogers as having a disability.

271. As a direct and proximate result of Defendants' disability discrimination and failure to provide Plaintiff Rogers with a reasonable accommodation, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000. Plaintiff is also entitled to reinstatement and attorneys' fees.

272. Defendants Horwitz's and Haba's discrimination was willful, wanton, intentional, malicious, reckless and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.


**COUNT 10**
**42 U.S.C. § 1983—Occupational Liberty Claim**
**Against Defendant James Pasch**

273. All of the foregoing paragraphs are incorporated as though fully set forth here.

274. Regarding the shooting of Jaquan Jones, Defendant Pasch stated, "the incident is horrible and was avoidable."

275. Regarding the shooting of Jaquan Jones, Defendant Pasch stated, "In my opinion, the use of unjust deadly force cannot result in a second chance."

276. Defendant Pasch publicly disclosed his above false and stigmatizing statements.

277. Defendant Pasch disseminated his stigmatizing statements on his public city council Facebook page, to the Cleveland Jewish News and to Channel 19 News.

278. Defendant Pasch's public disclosures impugned Plaintiff Rogers's good name, honor and reputation.

279. Defendant Pasch's public disclosures occurred after Plaintiff Rogers suffered adverse employment action.

280. Defendant Pasch's statements also caused Plaintiff Rogers to suffer a tangible loss of employment opportunities.

281. For example, Plaintiff Rogers applied for a similar job and the employer stated: "I am in receipt of your application to work with my company. Under normal circumstances this would be a no-brainer. Your knowledge, work ethic, experience and personality would make you a viable member of my company. With that established, unfortunately, at this time your application is being held in abeyance. It truly pains me to watch your situation in Beachwood continue to unfold. In over 40 years of law enforcement, I have never seen a municipal government mismanage an internal investigation as they have. To add insult to injury—inept, ignorant and uninformed emotional comments made by Council President James Pasch and resident Mallory McMaster didn't accomplish anything but fuel the current volatile situation."

282. As a direct and proximate result of Defendant Pasch's false, publicly disclosed stigmatizing statements, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000. Plaintiff is also entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

283. Defendant Pasch acted willfully, wantonly, intentionally, maliciously, recklessly and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.

**COUNTS 11–14**
**Ohio Common Law Malicious Criminal Prosecution;**
**Ohio Common Law Civil Conspiracy to Maliciously Criminally Prosecute;**
**Ohio Common Law Abuse of Process; and**
**Ohio Common Law Civil Conspiracy to Abuse Process**
**Against Defendants Martin Horwitz, Gary Haba, James Pasch, Diane Calta, Nathalie Supler, and City of Beachwood**

284. All of the foregoing paragraphs are incorporated as though fully set forth here.

285. Defendants Horwitz, Haba, Pasch, Calta, Supler, and Beachwood overtly acted by repeatedly and maliciously requesting that Plaintiff Rogers be criminally prosecuted for justifiably shooting Jaquan Jones.

286. Defendants' requests were repeatedly rebuffed.

287. Notwithstanding, Defendants continued on their mission to, without probable cause, get Plaintiff Rogers criminally prosecuted for justifiably shooting Jaquan Jones.

288. Defendants Horwitz, Haba, Pasch, Calta, Supler, and/or Beachwood agreed, expressly or impliedly, to get Plaintiff Rogers before a grand jury.

289. Defendants Horwitz, Haba, Pasch, Calta, Supler, and/or Beachwood agreed, expressly or impliedly, to get Plaintiff Rogers indicted.

290. Defendant Pasch was incensed that Plaintiff Rogers was not immediately placed in custody following Plaintiff Rogers's justified use of force; Defendant Pasch

repeatedly demanded of Defendants Horwitz, Haba, and Calta that Plaintiff Rogers be terminated and indicted as soon as possible.

291.   Defendants maliciously instituted and/or continued a criminal prosecution of Plaintiff Rogers and the criminal prosecution was terminated in his favor.

292.   Law enforcement officials from Ohio BCI, the Ohio Attorney General's Office, and the Cuyahoga County Prosecutor's Office advised Defendants that Plaintiff Rogers cannot be criminally prosecuted for shooting Jaquan Jones.

293.   Defendants maliciously refused to accept that conclusion.

294.   Defendants knew Jaquan Jones had been indicted by a Cuyahoga County Grand Jury for Felonious Assault of a Peace Officer due to running over Plaintiff Rogers.

295.   Because Jaquan Jones admitted to "attempting" to run Plaintiff Rogers over with a vehicle, a deadly weapon, Defendants, all of whom are lawyers or are in law enforcement, knew Plaintiff Rogers had justification to respond in kind with a deadly weapon.

296.   Defendants knew Plaintiff Rogers was actually run over.

297.   Defendants knew Plaintiff Rogers shot Jaquan Jones after he was run over by Jaquan Jones.

298.   Defendants knew Jaquan Jones had a loaded handgun on his person while he was in the stolen vehicle.

299.   Defendants finally compelled what they were asking for and, on October 9, 2020, the case was presented to a Cuyahoga County Grand Jury.

300. The same day the case was presented, the Cuyahoga County Grand Jury returned a No Bill and discharged Plaintiff Rogers for shooting Jaquan Jones.

301. The criminal proceeding Defendants instituted and continued was terminated in favor of Plaintiff Rogers because the Grand Jury declined to indict him.

302. In proper form and with probable cause, Defendants conspired, expressly or impliedly, to set the Grand Jury in motion to accomplish an ulterior purpose for which it was not designed: to get just cause to terminate Plaintiff Rogers from BPD/Beachwood.

303. In proper form and with probable cause, Defendants set the Grand Jury in motion to accomplish an ulterior purpose for which it was not designed: to get just cause to terminate Plaintiff Rogers from BPD/Beachwood.

304. Defendants are now conducting their own investigation into the shooting of Jaquan Jones.

305. Defendants do not accept the finding of the Grand Jury.

306. Defendants' internal investigation is being conducted to try and find just cause to terminate Plaintiff Rogers from BPD.

307. Under the CBA, Plaintiff Rogers can only be terminated for "just cause."

308. The Grand Jury did not provide Defendants with just cause to terminate Plaintiff Rogers from BPD.

309. Jaquan Jones' Pleas of Guilty did not provide Defendants with "just cause" to terminate Plaintiff Rogers from BPD.

310. On October 10, 2020, Defendant Horwitz stated the following to Channel 19 News regarding the internal investigation: "I have instructed Chief Stillman to make this a top priority and I am hopeful we will have his Department's report within the next 14 days."

311. Defendant Horwitz interviewed candidates for BPD's Chief of Police vacancy in the summer and fall of 2020.

312. Defendant Horwitz discussed Plaintiff Rogers during the interviews.

313. Defendant Horwitz ultimately chose to hire Chief Kelly Stillman to be BPD's Chief of Police because he received assurance that there is "just cause" for Plaintiff Rogers' termination.

314. As a direct and proximate result of the foregoing, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

315. Defendants acted willfully, wantonly, intentionally, maliciously, recklessly and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.


**COUNT 15**
**Ohio Common Law Civil Aiding and Abetting of**
**Malicious Prosecution and Abuse of Process**
**Against Defendants Martin Horwitz, Gary Haba, James Pasch, Diane Calta, Nathalie Supler, and City of Beachwood**

316. All of the foregoing paragraphs are incorporated as though fully set forth here.

317. Defendant Beachwood, by and through its agents, committed the torts of Malicious Prosecution and Abuse of Process as described in Counts 11–14.

318. Defendants Horwitz, Haba, Pasch, Calta, and Supler aided Defendant Beachwood in committing Malicious Prosecution and Abuse of Process by advocating for and instituting the Grand Jury proceedings against Plaintiff Rogers.

319. Defendants Horwitz, Haba, Pasch, Calta, and Supler knew they were helping Defendant Beachwood commit the torts of Malicious Prosecution and Abuse of Process at the time they provided Defendant Beachwood with their unlawful assistance.

320. Defendants Horwitz, Haba, Pasch, Calta, and Supler, as agents of Defendant Beachwood, knowingly and substantially assisted Defendant Beachwood in furthering and committing the torts of Malicious Prosecution and Abuse of Process through their unlawful conduct.

321. As a direct and proximate result of the foregoing, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

322. Defendants acted willfully, wantonly, intentionally, maliciously, recklessly and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.


**COUNT 16**
**Intentional Infliction of Emotional Distress**
**Against All Defendants**

323. All of the foregoing paragraphs are incorporated as though fully set forth here.

324. Defendants intended or should have known their actions would result in serious emotional distress to Plaintiff Rogers.

325. Defendants' conduct was so extreme and outrageous that it went beyond all possible bounds of decency and it is utterly intolerable in a civilized community.

326. Defendants' conduct was a direct and proximate cause of Plaintiff Rogers's psychic injuries.

327. The mental anguish suffered by Plaintiff Rogers because of Defendants' conduct is serious and of a nature that no reasonable person could be expected to endure.

328. As a direct and proximate result of the foregoing, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

329. Defendants acted willfully, wantonly, intentionally, maliciously, recklessly and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.

### COUNTS 17–19
**Civil Action for Damages for Criminal Act—R.C. 2307.60,** *et seq.***;**
**Violation of Ohio Privacy Act; and**
**Violation of Federal Privacy Act**
**Against Defendants Diane Calta and City of Beachwood**

330. All of the foregoing paragraphs are incorporated as though fully set forth here.

331. R.C. 2307.60(A)(1) provides: "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive

or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

332. R.C. 2921.24(A), disclosure of confidential information, provides: "(A) No officer or employee of a law enforcement agency or court, or of the office of the clerk of any court, shall disclose during the pendency of any criminal case the home address of any peace officer, parole officer, prosecuting attorney, assistant prosecuting attorney, correctional employee, or youth services employee who is a witness or arresting officer in the case."

333. Defendant Calta intentionally, maliciously, willfully, wantonly, recklessly, and/or in bad faith, publicly disclosed Plaintiff Rogers's home address (and phone number) during the pendency of Jaquan Jones's criminal case.

334. Defendant Calta disclosed Plaintiff Rogers's home address and phone number to the Cleveland Jewish News.

335. Plaintiff Rogers is a witness in Jaquan Jones' criminal case.

336. Defendant Calta is an "officer or employee of a law enforcement agency or court, or of the office of the clerk of any court".

337. Defendant Calta violated R.C. 2921.24(A).

338. As a direct and proximate result of the foregoing, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

339. Defendant Calta acted willfully, wantonly, intentionally, maliciously, recklessly and in conscious disregard for Plaintiff Rogers's rights. Accordingly, Plaintiff Rogers seeks punitive damages in excess of $75,000.

**COUNT 20**
**Ohio Common Law Loss of Consortium**
**Against All Defendants**

340.    All of the foregoing paragraphs are incorporated as though fully set forth here.

341.    At all relevant times, Plaintiff Jacalyn Rogers was married to Plaintiff Blake Rogers.

342.    As a direct and proximate result of Defendants' conduct as described herein, Plaintiff Jacalyn Rogers has suffered a loss of consortium, services, comfort, care, love, guidance and solace from Plaintiff Blake Rogers.

**COUNT 21**
**Retaliatory Discharge in Violation of R.C. § 4112.02(I)**
**Against Defendants Martin Horwitz and City of Beachwood.**

343.    All of the foregoing paragraphs are incorporated as though fully set forth here.

344.    Plaintiffs Blake and Jacalyn Rogers engaged in protected activity when they filed a lawsuit challenging and opposing statutorily prohibited discrimination on October 12, 2020, in the Cuyahoga County Court of Common Pleas. (Doc #: 1-1, PageID #: 4–46.)

345.    This state-court complaint alleged, in part, that the Defendants engaged in the following acts of statutorily prohibited discrimination: (1) retaliating against Plaintiff Rogers for having requested and made use of medical leave under the FMLA; (2) discriminating against Plaintiff Rogers on the basis of race in violation of R.C. § 4112.02(A); (3) discriminating against Plaintiff Rogers on the basis of an actual or perceived disability in violation of R.C. § 4112.02(A) and the Americans

with Disabilities Act; and (4) interfering with Plaintiff Rogers' liberty interests in obtaining employment in violation of the Fourteenth Amendment to the Constitution.

346.   Filing a lawsuit challenging statutorily prohibited discrimination is protected activity.

347.   On November 16, 2020, the Defendants removed the Plaintiffs' civil action to federal court, thus establishing their knowledge of the Plaintiffs' protected activity. (Doc #: 1, PageID #: 1–3.)

348.   There is a causal connection between the Plaintiffs' civil action and Plaintiff Rogers' termination because the conduct Defendants Horwitz and Beachwood alleged Plaintiff Rogers engaged in was not adequate grounds for termination.

349.   Plaintiff Rogers received a "no bill" from a Cuyahoga County Grand Jury on October 9, 2019, in connection with the criminal allegations set against him resulting from the June 27, 2019 incident.

350.   Further, Jaquan Jones entered a guilty plea to an attempted assault charge for having ran Plaintiff Rogers over with a stolen car during the June 27, 2019 incident.

351.   The combination of those two factors indicates that Plaintiff Rogers' use of force during the June 27, 2019 incident was reasonable and justified.

352.   Defendants Horwitz and Beachwood alleged at the February 18, 2021 administrative proceeding, and again in the February 22, 2021 termination letter, that Plaintiff Rogers was "not entirely honest and forthcoming about" the June 27, 2019 incident; however, Defendants Horwitz and Beachwood do not explain this

position, and offered no explanation or evidence indicating how or why this allegation against Plaintiff Rogers was valid.

353. Defendants Horwitz and Beachwood did not explain the reasoning behind why Plaintiff Rogers was terminated because they cannot legitimately do so.

354. Defendants Horwitz and Beachwood had no legitimate basis to terminate Plaintiff Rogers' employment and used this illegitimate *Loudermill* pre-disciplinary hearing, and subsequent actual termination, as pretext to retaliate against Plaintiff Rogers for having filed a civil action against them.

355. As a direct and proximate result of the foregoing, Plaintiff Rogers has suffered and will continue to suffer economic and noneconomic damages in excess of $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Blake and Jacalyn Rogers respectfully request that the Court grant them judgment against Defendants, jointly and severally, as follows:

A. That the Court provide injunctive relief by: (1) compelling Defendants Martin Horwitz and City of Beachwood to reinstate Plaintiff Blake Rogers; and (2) compelling Defendants Martin Horwitz and City of Beachwood to promote Plaintiff Blake Rogers to sergeant;

B. That the Court award Plaintiffs compensatory damages, economic and noneconomic, for, among of things, emotional pain and suffering, loss of enjoyment of life, stress, depression, back pay, front pay, loss of pension, and any

and all other continuing injuries and damages they suffered and will suffer in the future;

C.     That the Court award Plaintiff Blake Rogers punitive damages against each individual Defendant due to their maliciousness, bad faith, willfulness, wantonness, recklessness and conscious disregard for his rights and safety;

D.     That the Court award Plaintiff Blake Rogers attorney and expert fees, costs, and interest; and

E.     That the Court award Plaintiffs such other and further relief as may be just, equitable and proper.

Respectfully submitted,

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)
ZIPKIN WHITING CO., L.P.A.
3637 South Green Road
Beachwood, Ohio 44122
Phone: 216-514-6400
Fax: 216-514-6406
Email: zfwlpa@aol.com
      kgross@zipkinwhiting.com

*Counsel for Plaintiffs Blake and Jacalyn Rogers*

### <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

/s/ Kevin M. Gross
Lewis A. Zipkin, Esq. (0030688)
Kevin M. Gross, Esq. (0097343)

*Counsel for Plaintiffs Blake and Jacalyn Rogers*

## CERTIFICATE OF SERVICE

A true and correct copy of the Second Amended and Supplemental Complaint

has been served on April 27, 2021, upon:

John T. McLandrich, Esq.
Terence L. Williams, Esq.
MAZANEC, RASKIN & RYDER CO., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139
Phone: (440) 248-7906
Fax: (440) 248-8861
Email: jmclandrich@mrrlaw.com
　　　twilliams@mrrlaw.com


　　　　　　　　　　　/s/ Kevin M. Gross
　　　　　　　　　　　Lewis A. Zipkin, Esq. (0030688)
　　　　　　　　　　　Kevin M. Gross, Esq. (0097343)

　　　　　　　　　　　*Counsel for Plaintiffs Blake and Jacalyn Rogers*