Exhibit 1

In the Matter of the Arbitration )
)                       Grievant:   Officer Blake Rogers
between )
)
the City of Beachwood, OH )
)                      FMCS Case Number:   210226-04390
and )
)
the Fraternal Order of Police )

BEFORE:  Arbitrator Christopher L. Beebe

APPEARANCES:

For the City of Beachwood:          Barry Freeman, Roetzel & Andress

For the Fraternal Order of Police:          Douglas Behringer, FOP Ohio Labor Council, Inc.

Place of Hearing:          Beachwood OH Emergency Operations Center

Date of Hearing:          July 30, 2021

Date of Award:          October 12, 2021

AWARD: The disciplinary grievance is sustained. The City did not prove all of the charges it cited in the termination letter. Additionally, the City committed due process errors in its response to the grievant's actions in the June 27, 2019 officer-involved shooting. Given the number and seriousness of these errors, the arbitrator finds the City did not have just cause to terminate the grievant, and orders the remedy indicated herein.

The non-disciplinary grievance is also sustained. The City violated Article 22, Section 3 of the Collective Bargaining Agreement when it released the grievant's Notice of Charges to a news agency, and is ordered to cease and desist such violations.

*Christopher L. Beebe*
Christopher L. Beebe, Arbitrator

**STATEMENT OF THE CASE**

Although a single case number has been assigned by the Federal Mediation and Conciliation Service (FMCS # 210226-04390), the parties agreed at the hearing that there are two grievances in dispute. Both grievances flow from an incident Officer Blake Rogers (grievant), was involved in on June 27, 2019. One grievance involves the termination of the grievant's employment, effected via correspondence dated February 22, 2021. The other grievance involves the release by the City of Beachwood (City), to a local news agency, a Notice of Charges and Pre-Disciplinary Hearing pertaining to the grievant.

These matters proceeded unresolved through the parties' grievance procedure and were heard by the undersigned on July 30, 2021. The evidentiary record was closed on that date. The parties elected to submit post-hearing briefs, both of which were received by October 4, 2021.

**ISSUE**

There are two grievances to be resolved, and therefore two separate issues:

1. Did the City of Beachwood have just cause to issue a termination to the Grievant? If not, what is the appropriate remedy?

2. Did the City's release to a local news agency, prior to a final interdepartmental ruling and the service of that ruling on the grievant, of a Notice of Charges and Pre-Disciplinary Hearing violate the Collective Bargaining Agreement (CBA, contract)? If so, what is the appropriate remedy?

**BACKGROUND**

On the afternoon of June 27, 2019, the Beachwood Police Department (BPD) received information from Beachwood Place Mall Security that a theft was in progress at Dillard's, a store within the mall. Included was a description of the suspect, who was fleeing the scene of the alleged theft. Several BPD officers responded, including Officer Anthony Gray, Officer Patrick Szuhay, Lt. Chris Atterbury, and the grievant.

2

As the grievant arrived at the mall, driving east through the parking lot along the perimeter of Saks (another store at the mall), he saw what he believed to be the suspect hiding near some bushes. As the grievant approached in his cruiser, the suspect ran into the parking lot, to a gray Nissan[1] which was parked facing west. The grievant turned left (north) down an aisle in the parking lot, while the suspect entered the Nissan, which was to the grievant's right. The grievant stopped his cruiser and exited. Moving around the front of his cruiser toward the Nissan, he drew his service weapon and repeatedly ordered the suspect to exit the vehicle.

The suspect started the vehicle and reversed from the parking spot, to the east, at a high rate of speed. He backed out of the parking space and into the aisle, positioning the vehicle to flee to the north. Just as he was backing from the space, Lt. Atterbury was arriving in a cruiser, driving north in the aisle the suspect had backed into. Seeing this cruiser blocking his escape route, the suspect then accelerated back into the parking space he had exited, this as the grievant was moving out of the space on foot, still issuing orders to the suspect at gunpoint. As the suspect accelerated rapidly past the grievant he ran over the grievant's left foot, and the grievant fired two rounds from his service weapon into the driver's side window. The suspect continued accelerating forward, struck a parked car while maneuvering past the grievant's cruiser, and fled the scene.

On the same date as the incident, BPD requested that the Ohio Attorney General's Office Bureau of Criminal Investigation (BCI) conduct an investigation of the incident. This verbal request was formalized by a letter, dated June 28, 2019, authored by BPD Chief Gary Haba.[2]

On July 9, 2019, Chief Haba authored a memorandum to Beachwood Mayor Martin Horwitz, requesting permission to place the grievant on paid administrative leave due to his being involved in an on-duty shooting. The leave was to begin June 28, 2019.

On October 28, 2019, BCI Special Agent Al Bansky submitted a summary report to the Ohio Attorney General's Office Special Prosecutions Section. In the course of the investigation, it was determined that the grievant's shots did, in fact, hit the suspect. The suspect was identified as Jaquan Jones (Jones), and he survived his wounds.

---

[1] The Nissan is described variously as gray or silver, but is described as gray in the BCI reports.
[2] Gary Haba was Beachwood Police Chief at the time of the incident. During the course of events, he retired. Kelly Stillman was Police Chief at the time the termination was issued to the grievant.

On December 30, 2019, the Ohio Attorney General's Office was appointed as special prosecutor for the case, and on March 31, 2020, Beachwood Director of Law Diane Calta was notified by Assistant Attorney General Micah Ault that the Attorney General's office determined it was not appropriate to pursue any misdemeanor charges.

At some point, the shooting of Jones by the grievant was referred to the Cuyahoga County Grand Jury. On October 8, 2020, a "no bill" was returned by the grand jury, effectively ending the potential for any criminal charges being brought against the grievant.

On October 26, 2020, Jones pled guilty in Cuyahoga County Common Pleas Court to attempted felonious assault, among other charges, for his actions in the mall parking lot.

On February 8, 2021, a Notice of Charges and Pre-Disciplinary Hearing (Notice) was emailed to Chuck Aliff, of the Union. The following day, the same Notice was provided to a staff reporter of the Cleveland Jewish News.

The pre-disciplinary hearing was held on February 18, 2021, as scheduled. Subsequently, the grievant was issued a termination dated February 22, 2021. The grievances at issue were filed the following day.

## RELEVANT CONTRACT PROVISIONS

## ARTICLE 7
## DISCIPLINE

**Section 1.**  Disciplinary action taken by the City for a non-probationary employee shall be only for just cause.

\*                              \*                              \*

**Section 2.**  A non-probationary employee shall be provided a written notice of the charges and the reason(s) for disciplinary action(s) to be taken. The City shall provide the employee with a pre-disciplinary conference seventy-two hours prior to the issuance of discipline that may result in suspension, loss or reduction of pay, demotion or termination of employment. The employee

4

shall be entitled to attend the conference, with or without a F.O.P. representative of his or her choosing, or to waive attendance to the conference.

## ARTICLE 22

## PERSONNEL FILES AND POLICY

**Section 3.**  When an employee is charged with or is under investigation for alleged violations of departmental rules and regulations, reasonable efforts consistent with applicable law shall be made to withhold publication of the employee's name and the extent of the disciplinary action taken or contemplated until such time as a final interdepartmental ruling has been made and served upon the employee, except where the employee is charged with a felony.

*                    *                    *

**Section 5. Discipline Records.** The record of all disciplinary procedure shall be expunged from the officer's file:

A.  After one (1) year if the disciplinary procedure resulted in a reprimand, or a loss of wages of not more than one (1) day, and more than one (1) year has passed without a second violation of the same or a similar offense.

## RELEVANT REGULATIONS

## BEACHWOOD POLICE DEPARTMENT USE OF FORCE POLICY, NUMBER 06-01

*                    *                    *

## PROCEDURES
.10 USE OF FORCE

*                    *                    *

5

F.  While various levels of force exist, each officer is expected to respond with that level and duration of force that reasonably appears appropriate under the circumstances at the time to successfully accomplish the legitimate law enforcement purpose in accordance with this policy.

*        *        *

.20 THE USE OF DEADLY FORCE

*        *        *

A.  An officer may employ deadly force only in those situations where the officer objectively and reasonably believes there is an imminent threat of death or serious physical injury to the officer or to another person, based on the totality of the circumstances known to the officer at the time.

*        *        *

B.  In the case of a fleeing suspect, the officer must have probable cause to believe the suspect, if not apprehended, poses a threat of serious physical harm to the officer or others, and that the suspect must be stopped through the use of deadly force (Tennessee v. Garner, 471 U.S. 1 1985). The reasoning articulated by the officer must include:

- The officer had probably cause to believe the suspect committed a crime of violence or threatened violence; and
- The suspect was armed, or presented an extreme danger to present arresting officers, future arresting officers, or to the public should arrest be delayed; and
- A warning is given prior to the use of deadly force, if feasible.

*        *        *

D.  Firing a weapon into a moving vehicle is limited to certain extreme situations such as in defense of self or others. Given that any officer's likelihood of successfully preventing the escape of a subject in any moving motor vehicle is very low, an officer choosing to fire at a fleeing vehicle must be fully prepared to justify this extreme action.

6

*                    *                    *

## BEACHWOOD POLICE DEPARTMENT STANDARDS OF CONDUCT, # 06
### Committing Unsafe Acts or Endangering Self or Others

Members shall not unlawfully commit acts or behave in such a manner that has the potential for endangering or injuring themselves, property or another person.

*                    *                    *

## EXAMPLES OF VIOLATIONS

*                    *                    *

E.  Handling, aiming, firing, unloading or loading a weapon contrary to established policies or procedures.

*                    *                    *

## BEACHWOOD POLICE DEPARTMENT STANDARDS OF CONDUCT, # 11

### Dishonesty or Untruthfulness

Members shall not lie, give misleading information, or falsify written or verbal communications in official reports or in their actions with another person or organization when it is reasonable to expect that such information may be relied upon because of the member's position or affiliation with this organization.

*                    *                    *

## BEACHWOOD POLICE DEPARTMENT STANDARDS OF CONDUCT, # 17

### Knowing, Observing and Obeying All directives, Rules, Policies, Procedures

7

Members shall make an affirmative, consistent effort to observe and comply with the directives, rules, policies, procedures, practices and traditions established for the effective efficient and safe operations of this organization. This standard applies to policies, procedures and practices that are written as well as those established by past patterns or practices.

Affirmative effort as the term is used here means to self-initiate acceptable ways to comply. In other words, look for ways to comply with the standard and do not look for exceptions to the standard.

                    *                    *                    *

**BEACHWOOD POLICE DEPARTMENT CODE OF ETHICS (Sworn Personnel), 01-05**

                    *                    *                    *

I consider the abilities to be courageous in the face of danger and to exercise restraint in the use of my powers and authorities to be the ultimate public trust.

                    *                    *                    *

I vow to be fully truthful and honest in my dealings with others. I deplore lies and half-truths that mislead or do not fully inform those who must depend on my honesty. I will obey the very laws that I am sworn to uphold. I will seek affirmative ways to comply with the standards of my department and the lawful direction of my supervisors.

                    *                    *                    *

I will affirmatively seek ways to avoid conflicts and potential conflicts of interest that could compromise my official authority or public image.

                    *                    *                    *

**POSITION OF THE CITY**

The City contends that the grievant has a history of violating City policies. His risky tactics include numerous improper high-speed pursuits; two occasions of improper procedure when

8

employing a Taser; and failing to report a collision between two police cruisers. Perhaps most significant, the grievant has defiantly stated to superiors that he will not obey policies if he doesn't agree with them.

On June 27, 2019, in yet another act of misconduct, the grievant used deadly force against a fleeing shoplifter. This use of force needlessly put himself and innocent bystanders in danger. The evidence demonstrates that the suspect was intent only on getting away from police. While he was doing so, the grievant exited his vehicle and almost immediately drew his service weapon, this while bystanders, including children, were in the immediate vicinity. The grievant's assertion that the fleeing shoplifter tried to kill him, using the car as a weapon, is contradicted by video evidence and witness statements.

According to the City, the grievant's claimed belief that the suspect may have had a gun is unlikely. He never warned fellow officers that the suspect might be armed, and remained silent about the suspect being potentially armed until an interview with BCI. Furthermore, the grievant never saw the suspect with a weapon.

The suspect never drove at the grievant, as the grievant claimed. Rather, he drove parallel to the grievant. The grievant's assertion that the suspect drove the vehicle towards him is refuted by the video. Rather than retreating, the grievant ran alongside of the suspect's vehicle, and was next to it when he fired his weapon. Throughout the incident, the grievant yelled commands at the suspect, but not once did he warn the suspect "stop or I'll shoot."

The City notes that the arbitrator's job is to determine whether Officer Rogers' termination was excessive, arbitrary or discriminatory. Given their role in society, to include the power given to them, law enforcement officers must be held to a higher standard than other public employees. The grievant's use of force should be judged in light of *Graham v. Connor*, 490 U.S. 386, 396 (1989), and its progeny.

These cases establish that the use of force is subject to a "reasonable officer" standard; the factfinder must rely primarily on video evidence; the Constitution prohibits deadly force to prevent a suspect from fleeing, unless the officer has objective probable cause the suspect poses an imminent threat of serious physical harm to others; deadly force is not justified once the suspect's car has moved away; shooting a fleeing suspect while following alongside the

9

suspect's car is without reasonable justification; and officer testimony that the suspect was using his vehicle to hurt or kill cannot contradict the video evidence or witness statements consistent with the video.

The City maintains that the grievant's claim that he believed he was going to be hit by the suspect is false, therefore grievant's use of deadly force was unjustified. Additionally, nearby civilians could have been injured by ricocheting bullets discharged from the grievant's weapon, and the Grievant was aware of the danger of ricochet.

The grievant's *Loudermill* claim is untimely and should therefore be void. In any case, *Loudermill* requires "an explanation of the employer's charges and evidence against him", and this was provided. Furthermore, *Loudermill* requires the grievant demonstrate actual, identifiable prejudice, and he has not done so.

In the City's view, the grievant's claim that he has no idea what he was accused of or why is ludicrous. He received *Loudermill* due process. He received a notice of the charges and the potential discipline against him. All *Loudermill* required the City to do was provide Rogers and the Union with (1) its evidence; (2) the charges; (3) the alleged violations; and (4) the potential discipline.

There is no disparate treatment in this case, as the Union claims. The cited incident of March 1, 2019, which involved other officers and a shooting, is not comparable. The grievant shot at a shoplifter in a busy mall parking lot, with families nearby. The other incident involved shots fired at a stolen police cruiser full of loaded weapons, and there was no evidence of families or children nearby.

As for the release to the media of the pre-disciplinary hearing notice, the subject of the second grievance, the City posits that the Union has not met its burden of proof in what is a non-disciplinary grievance. The City notes the applicable contract language makes any release of personnel records subject to applicable law, and Ohio law requires disclosure to the media upon request.

Finally, in the event the arbitrator should rule on the grievant's behalf, no damages are warranted. The grievant was on paid leave from the date of the incident until the date of

termination, so there are no pre-termination damages. Since he has been unable to work as a police officer since the incident, post-termination damages are likewise unwarranted.

In conclusion, both grievances should be denied. The grievant's conduct and dishonesty is grounds for termination. The video, audio and photos show the grievant needlessly employed deadly force against a shoplifter, who in fact was struck by one or more of his bullets. These actions endangered bystanders, including children. The grievant has a history of cowboy tactics. He recklessly or willingly violated safety policies because he wanted to get the "bad guy". He openly challenged those policies and his superiors' directives to follow policy.

The second grievance must be denied because the contract allows media disclosures consistent with the law, and the Union has not shown the disclosure to be otherwise.

In addition to court decisions and published arbitration awards referenced in its post-hearing brief, the City provided the following awards in support of its position:
- Case number 53 390 00505 94, Arbitrator Jerry A. Fullmer
- Case number 53 390 00455 95, Arbitrator Anthony J. Carpinelli
- Case number 53 300 00181 02, Arbitrator Thomas R. Skulina
- Case number 201202-AAA, Arbitrator Jerry A. Fullmer

## POSITION OF THE UNION

The Union contends the City must first prove the grievant is guilty of the allegations brought against him. If he is proven to be guilty, the City must then prove that termination is the appropriate level of discipline.

As a discharge case, the City bears a higher quantum of proof than in an non-discharge case, as termination equates to industrial capital punishment. Allegations of dishonesty and excessive use of force are among the most serious allegations that can be made against a law enforcement officer, and the City has not carried its burden with regard to these charges. In the Union's view, the City has failed to show how the grievant's actions violated any of the cited policies.

The City claims that the grievant's actions were inconsistent with his assertion that he was in fear for his life. Chief Kelly Stillman testified that if the grievant were actually in fear for his life, he wouldn't have fired only two rounds at the driver of the vehicle. Rather, he would have continued firing until the threat was neutralized. The Union believes the fact that the grievant fired only twice demonstrates that he was complying with the use of force policy.

It is well-established in case law that "the "reasonableness" of a specific use of force must be judged from the perspective of a reasonable officer on the scene. Further, this assessment must take into consideration the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. The grievant's statement clearly demonstrates that he was in fear of being killed by the driver of the car. According to legal precedent, only the grievant was in a position to determine the use of force.

The grievant was, in fact, the target of a threat of serious physical harm. This is evident not only from the fact that the grievant's foot was ran over by the suspect's car, but also from the fact that the suspect, Jones, pled guilty to felonious assault of a police officer.

The Union notes that Jones was far from the petty shoplifter the City painted him to be. He was driving a stolen vehicle that contained at least two guns, drove recklessly and erratically while trying to evade pursuing police officers, broke into a home during his flight and, prior to the incident at issue, was known for stealing cars and robbing people.

The city repeatedly claims that the grievant endangered the bystanders in the parking lot. The grievant was cognizant of the family near the scene and did not fire towards them.

As for the City's claim that the grievant lied about the incident, throughout this process the City has not specified how the grievant was dishonest. Neither the Union nor the grievant were provided with specific reasons for the proposed discipline or an explanation of the City's evidence. Both the CBA and the *Loudermill* decision[3] require the provision of such information, so the employee can provide a meaningful response. A list of evidence and a list of policies does not fulfill this obligation.  Without some explanation of how his conduct violated the policies, the grievant is unable to adequately defend himself.

---

[3] *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)*

The first time the Grievant was interviewed by the Employer about this matter, was at the arbitration hearing. At no point did the Employer state how the Grievant violated any policy or was dishonest. In fact, they have consistently refused to answer the question. "Watch the video" is not an answer.

The City made no internal investigation into the conduct of the grievant. Due process requires a full and fair investigation. Rather than conduct an internal investigation, the City merely reviewed its policies, the witness statements, the videos and the BCI investigation. The BCI investigation was a criminal review, not an internal investigation. The City is obligated to conduct an internal investigation rather than relying solely on a third-party investigation. Even so, the BCI report supports the grievant's account of the incident.

While Chief Stillman testified that the City relied on the BCI investigation to discharge the grievant, the City's opening argument demonstrates that the City relied solely on the video to arrive at its decision. For the City to rely solely on the video to determine whether the grievant should be terminated is erroneous. A BCI video and document review notes that video evidence can be very problematic.[4] The City's frame-by-frame analysis of the video at the hearing is a failed attempt to show inconsistency or wrongdoing on the grievant's part. In fact, the grievant has been consistent throughout.

The City's introduction at the hearing of a prior disciplinary action against the grievant is improper. Not only does that discipline have no bearing on the issue at hand, but the parties' CBA clearly indicates it should have been expunged from the grievant's file.

The Personnel Early Warning System (PEWS) reports the City focused on during the hearing are not discipline, and none of the PEWS submitted at the hearing are for similar alleged misconduct.

The City did not provide testimony from witnesses who were at the scene of the incident. Chief Stillman testified that these statements were relied upon in determining the discipline at issue, and the accused has a right to confront his accusers. More specifically, the grievant and the Union have a right to cross-examine these witnesses. Reliance on these statements for a

---

[4] City exhibit C-21, p. 13

termination does not meet the standard of just cause. The statements are inconsistent with one another and with other evidence.

The Union asserts that the grievant is the victim of disparate treatment. During an incident on March 1, 2019, other officers were involved in a pursuit in which shots were fired and multiple police vehicles and other property damaged.[5] The handling of that situation differs from that of the grievant's in numerous ways.

That incident was investigated by BCI, but also was investigated internally by the City, while the incident involving the grievant was not. The record demonstrates that, unlike the grievant, the officers in that incident were provided with detailed explanations as to how their conduct varied from applicable policies. Several of these officers were found by the City to have committed serious infractions. However, none of them was given discipline as severe as the grievant.

In perhaps the most egregious example, Officer Derik Rodriguez left his cruiser unattended, unsecured and running, with the key in the ignition while he engaged in a foot pursuit. The suspect eluded him and other officers and stole the cruiser, causing property damage and driving it towards other officers. Despite the seriousness of this situation, Officer Rodriguez was issued a written reprimand.

Another difference between the treatment of the officers involved in the March incident is that their service records were used to mitigate the discipline they received. Yet the grievant's numerous positive entries in his service record, including positive performance evaluations, were not considered. The City apparently looked only at negative PEWS reports and his prior discipline.

The Union's defense of the grievant has been prejudiced by the fact that the key piece of evidence relied upon by the Employer to justify termination, the Chief's Report, was never produced. Additionally, the arbitrator permitted the City, in its case-in-chief, to call the grievant as its first witness. This is contrary to guidance provided by Elkouri & Elkouri.[6]

---

[5] Union Exhibit 4 (U-4)
[6] How Arbitration Works, (2003) 8th Edition

As for the second grievance, the contract prohibits the City from releasing an employee's name and contemplated disciplinary action until the final interdepartmental ruling has been made. The release of the pre-disciplinary notice to the media prior to the issuance of the grievant's termination violates this provision.

In summary, the City lacked just cause and violated the Grievant's due process rights. The Employer conducted no internal investigation of any kind. BCI agents, the undisputed experts in use of force and officer involved shootings in Ohio, found no dishonesty nor improper use of force. The use of force policy includes no duty for officers to retreat in use of force situations. There was nothing unlawful about the grievant's actions, as is evident from the fact that a grand jury returned a no bill with regard to his actions.

The Union respectfully requests that the grievance be sustained and the grievant immediately reinstated with full back pay and benefits as if he had never been discharged. Alternatively, the Union requests a modification of the discipline in accordance with the terms of the CBA.

In addition to court decisions and published arbitration awards referenced in its post-hearing brief, the Union provided the following award in support of its position:

- FMCS case number 190528-07521, Arbitrator Howard D. Silver

## DISCUSSION AND OPINION

There is no question that the incident at issue here was serious in nature. The end result of a situation that developed very quickly and, conversely, consumed a significant amount of time and effort afterwards, was the termination of the grievant. This also comprises a serious issue, for the City, the Union and, most of all, the grievant.

There are two grievances involved. One alleges the City did not have just cause to terminate the grievant. This being the more serious of the two grievances, it will be addressed first. As a disciplinary matter, the burden of proof in this grievance falls on the City.[7]

---

[7] The Union objected to the City calling the grievant as its first witness and, in its post-hearing brief, cited Elkouri and Elkouri as the authority for this objection. The arbitrator overruled the Union's objection at the hearing, as the advocate did not provide a specific explanation as to how the grievant's case would be

The second grievance alleges the City violated the contract by releasing to a local news agency the grievant's Notice of Charges and Pre-Disciplinary Hearing prior to a final interdepartmental ruling, and the service of that ruling on the grievant. The burden of proof in that grievance, being a non-disciplinary matter, falls on the Union.

The grievant is charged with failing to properly perform his duties as it relates to the officer-involved shooting on June 27, 2019, and not being entirely honest and forthcoming about the shooting. Specifically, the City questioned his use of deadly force against a shoplifter with bystanders, including children, in close proximity.[8]

The Union emphasized the fact that the suspect was driving a stolen vehicle, that the BCI investigation revealed there were at least two handguns in the vehicle, and that Jones was convicted of numerous crimes as a result of the investigation. In its post-hearing brief, the City argued that the only issue with regard to the grievant's decision-making is what he knew at the time of the actual incident. The arbitrator agrees with the City on this point, and only that information will be considered in evaluating just cause.

In the same vein, the Union urges that since a grand jury considered the grievant's actions and returned a no bill, then the grievant must be absolved of any wrongdoing. To the contrary, the arbitrator's role is not necessarily to follow a finding by a grand jury. If that finding resolved the matter, there would be no need for arbitration. The question before the arbitrator is whether the City adhered to the contract in issuing the termination.[9]

The parties do not have an agreed-upon definition of "just cause." While just cause has no precise definition and contains no rigid rules that apply the same way in every case, the arbitrator utilizes a definition of just cause that poses the following six questions:

1) Is there a rule?

---

prejudiced by testifying as the City's witness. The arbitrator stands by that ruling in the analysis of this case. While Elkouri and Elkouri provides valuable guidance on most aspects of arbitration, the opinions contained therein are based upon input from only from those members of the American Bar Association's Committee on ADR in Labor and Employment Law who chose to respond to the call for opinions, and therefore is, in the opinion of the undersigned, not necessarily definitive. Further, the arbitrator is not bound by the applicable contract, or otherwise, to adhere to the opinions included in Elkouri and Elkouri.
[8] City exhibit C-2.
[9] *Supra.*

2) Is the rule reasonable?

3) Is the rule consistently and equitably enforced?

4) Was a thorough investigation completed?

5) Was the severity of the discipline reasonably related to the infraction itself and in line with discipline that is usually administered, as well as to the seriousness of the employee's past record?

6) Was the disciplinary action taken in a timely manner?

The rules the grievant is accused of violating are cited in both the Notice and in the termination letter. Additionally, copies of the rules were submitted as evidence at the hearing. There was no question as to the grievant's awareness or familiarity with the rules. Likewise, the reasonableness of the rules was not questioned in any way.

Rules must be consistently and equitably enforced. While no issues of consistency were raised, the Union alleges the grievant was not treated the same as other officers who were involved in a shooting just a few months prior to the incident the grievant was involved in.

The City maintains there was no disparate treatment because the cited incident of March 1, 2019 is not comparable. The City notes that the grievant shot at a shoplifter in a busy mall parking lot, with families nearby. The other incident involved shots fired at a stolen police cruiser "full" of loaded weapons,[10] and there were no innocent bystanders.

Of the five officers involved in the March incident, the arbitrator finds that the actions of Officers Terrill Rodgers, Anthony Gray, and Derik Rodriguez are those that raise questions of disparity.

The evidence[11] does not support the City's argument that there were no innocent people around when Officer Terrill Rodgers fired his service weapon at the stolen police cruiser. His written reprimand states "there was an uninvolved motorist and residential homes in the area when you fired your weapon." On a similar note, Officer Gray's written warning states that he "passed a parked police vehicle at 56 MPH and nearly became involved in a head-on collision with an uninvolved vehicle." Officer Derik Rodriguez, whose actions left the police cruiser and the loaded weapon(s) it contained available to the suspect, received a letter of reprimand.

---

[10] City's post-hearing brief

[11] U-4

17

The rules that the grievant was charged with violating are in some instances the same rules these officers were charged with violating.

Given the emphasis the City places on the fact that innocents were in the vicinity when the grievant fired his service weapon, this action is considered a key element of the termination. Based on the evidence, the actions Officers Rodgers and Gray endangered innocents. Yet the actions taken against these officers were far less severe than that taken against the grievant.

Additionally, the letters issued to Officers Rodgers, Gray and Rodriguez refer to positive aspects of the service of each, apparently as mitigating factors in deciding the final actions taken. Yet there is no evidence that the positive aspects of the grievant's service were considered as potential mitigating factors. Although the termination letter states "…the City reviewed…Officer Rogers' pre-incident files (prehire training file, personnel file, PEWS file, reprimand file.)", there is no mention of any positive aspect of the grievant's service. Likewise, the City's evidence at the hearing indicated no consideration of potentially mitigating factors.

The undisputed testimony of the grievant indicates that he received letters of appreciation, thank you letters from citizens, a commendation letter, and awards of excellence. Three of the grievant's annual employee evaluations,[12] all of which reflect positively on the grievant's performance, were entered into evidence.

The fourth element of just cause questions whether a thorough investigation was completed. Before administering the discipline, there must be an investigation to determine whether the employee committed the offense. This includes providing the employee, in reasonable detail, the charges being pursued, as well as providing the employee a reasonable opportunity to defend himself.

On the date of the incident, the City requested that BCI conduct an independent investigation of the incident.[13] The following day, June 28, 2019, Chief Haba formalized this request in a letter. The resulting work product can only be described as comprehensive. The BCI record is replete with documents, video, and audio.

---

[12] 2015, 2017, 2018, entered as U1-3
[13] City Exhibit C-13

The Union notes that the City conducted no internal investigation into the grievant's conduct. According to the Union, the BCI investigation was a criminal review, not an internal investigation, and the City is obligated to conduct an internal investigation rather than relying solely on a third-party investigation.

The arbitrator is of the opinion that an internal investigation is not necessarily required. The issue is whether the investigation was objective and thorough. If a third party conducts an investigation, the City must decide if it has been such. If it has not, the City is obligated to attain these standards by either engaging another third party, or through an internal investigation. For example, if, after reviewing a third-party investigation, the City has additional questions or believes evidence has been overlooked, it can and should pursue that information. If, on the other hand, the City believes the third-party investigation has met the standards of objectivity and thoroughness, then all that is left for the City to do is to ensure a thorough review of that investigation and to conduct a pre-disciplinary hearing with the accused.

In the opinion of the arbitrator, there is no question that BCI is objective. BCI, being a part of the Ohio Attorney General's Office, has no allegiances to the City or the grievant. As for thoroughness, the BCI investigation seemingly left no stone unturned. The Union has not identified any relevant information overlooked by BCI.

Before discussing whether the investigation proved wrongdoing, the arbitrator will address the issue of the detail, or lack thereof, the City provided the grievant with regard to how his actions violated the cited policies.

The Union relies on both the contract and the *Loudermill* decision[14] in claiming that the employee must be given enough information so that he can provide a meaningful response. A list of evidence and a list of policies does not fulfill this obligation, according to the Union. Without some explanation of how his conduct violated the policies, the grievant is unable to adequately defend himself.

---

[14] *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)*

The City's position is threefold. First, the *Loudermill* claim is untimely, as it was not raised in the primary grievance. Second, the grievant did receive the due process required by *Loudermill*. Third, *Loudermill* requires that the grievant demonstrate actual, identifiable prejudice, and he has not done so.

On the threshold issue of timeliness, the City presented three arbitration awards.[15] In each of those cases, the timeliness issue pertains to the filing of a grievance in accordance with language contained in the applicable CBAs. In the instant case, the City is not claiming the grievance was filed untimely. Rather, it is claiming that an argument is untimely. The arbitrator rejects this contention for two reasons. First, there is nothing in the parties' contract regarding the timeliness of a particular argument being proffered in a grievance. Second, in the opinion of the undersigned, adherence to *Loudermill* is part and parcel of a just cause claim, and the primary grievance did in fact argue just cause.

The arbitrator cannot agree with the brevity with which the City describes its *Loudermill* obligation. Such a sterile approach does a disservice to both the employee and the City itself. A detailed explanation of how specific policies were violated might bring forth dialogue that could resolve the issue without proceeding to discipline. While *Loudermill* does not necessarily require a full evidentiary hearing, the City's position takes the opposite extreme.

On this point the Union submitted a decision by Arbitrator Silver[16]. While the Notice issued to the grievant in the case at bar was not as sparse as that issued to the grievant in the case before Arbitrator Silver, in the opinion of this arbitrator it still does not provide sufficient detail for the grievant to respond to the City's accusations. Both the Notice and the termination letter cite numerous policies, some of which are quite broad and others which seem redundant. At least one appears to be a catch-all. There is little in these letters explaining how the grievant violated these policies.

Furthermore, the lack of any meaningful explanation in the Notice and the termination letter in this case is in direct contrast to the amount of detail provided in the letters issued to the officers who were involved in the March incident. Even the grievant's prior reprimand, which is of far

---

[15] Case number 201202-AAA, Arbitrator Jerry A. Fullmer; Case number 53 300 00181 02, Arbitrator Thomas R. Skulina; and Case number 53 390 00455 95, Arbitrator Anthony J. Carpinelli
[16] FMCS case number 190528-07521

less consequence than a termination, contains more detail with regard to how his conduct equates to policy violations.

Regarding the City's contention that *Loudermill* requires the grievant demonstrate actual, identifiable prejudice, in this particular case the arbitrator is of the opinion that the prejudice is self-evident.

One example of the difficulty of connecting a mound of evidence to a list of policies is the citation, in the termination letter, of examples of violations of BPD Standard of Conduct # 6: "Handling, aiming, firing, unloading, or loading a weapon contrary to established policies or procedures." There are clearly numerous acts listed here, some of which may be exclusive to others. Some may be dependent on specific definitions. Yet there was no actual explanation as to how the City believed the grievant violated this provision.

The City implied in its post-hearing brief that the grievant shouldn't have had his service weapon out to begin with. According to the City, the grievant's claimed belief that the suspect may have had a gun is unlikely. It points out that the grievant did not warn other officers of the potential that the suspect was armed, and no weapon was ever seen by the grievant. The city notes that this assertion by the grievant was not raised until his BCI interview, which was July 1, 2019, four days after the incident. This is also the date of the grievant's supplement to the BPD incident report.[17]

While both the absence of any warning to other officers and the time lapse between the June 27 incident and the grievant's July 1 supplement to the BPD Incident Report are curious, the grievant's stated reason for drawing his service weapon is valid, in the opinion of the arbitrator. The video evidence[18] supports his contention that the suspect appeared to reach for something as he entered the car. Regarding the fact that the grievant never saw a weapon, the City's implication seems to be that unless an officer knows with certainty that a suspect possesses a weapon, that officer should not draw his own weapon. This implication is unsupported by any policy or other evidence and therefore is not considered relevant.

---

[17] U-9 / M-16
[18] U-19; Video Exhibit 3

The City asserts that the grievant lied when he said the suspect's vehicle came at him. In its post-hearing brief, it states "The suspect never drove at Officer Rogers. After the suspect's initial escape was blocked, he drove past (parallel to) Officer Rogers."

The Union notes that the statement of Officer Patrick Szuhay corroborates the grievant's claim. Officer Szuhay states "I was able see [sic] the vehicle drive forward directly toward Ptl. Rogers as he held the driver at gunpoint and ordered him to surrender."[19] Additionally, the BCI final report states "The subject then accelerated his vehicle toward Ofc. Rogers."[20]

In the arbitrator's opinion, whether or not the vehicle was driving towards the grievant may be a matter of perspective. The perspective of an individual who is within mere feet of a rapidly accelerating vehicle may be different than the perspective one who is watching a video after-the-fact, and without the attendant noise, adrenaline and other input.

Nevertheless, the initial complaint against Jones, filed June 28, 2019 in Shaker Heights Municipal Court[21] on behalf of the City of Beachwood, states "After backing up, JONES then put the vehicle in drive and drove forward at a high rate of speed toward Ptl. Rogers." (emphasis in original) The City cannot have it both ways. It cannot state the vehicle was driving toward the grievant when it is seeking to prosecute Jones, and later claim it was not driving toward the grievant when it is seeking to terminate him.

The City repeatedly emphasized the presence of bystanders when the grievant fired at Jones, and cited the grievant's admission during testimony that a bullet's trajectory can be changed by striking safety glass or a human being. It is undisputed that the grievant was aware of the bystanders and their location. The video evidence strongly suggests that the muzzle of his service weapon was aimed nearly 180 degrees, or in the opposite direction, from the bystanders when he fired.

The written reprimand of Officer Rodgers, for the March incident, provides some insight into the training received by BPD officers. Chief Haba, author of this reprimand, states "We also must be cognizant of everything that is downrange when engaging with a firearm…"[22] This statement

---

[19] City Exhibit C-16, p. 5
[20] City Exhibit C-17, p. 19
[21] U-7
[22] U-4

22

tends to minimize the City's stated issue of the civilians in the vicinity when the grievant discharged his weapon. The arbitrator is not persuaded that 180 degrees separation from the line of fire put the bystanders downrange of the grievant's shots.

To the extent that the City relied on the statements of the bystanders, that reliance seems misplaced, as those statements[23] contain erroneous conclusions. Melanie Wilson states the grievant "…didn't care if any of those bullets hit myself, my husband, this young lady or our kids." Ms. Wilson cannot speak to what the grievant cared about. Maverick Weaver stated the suspect "almost hit" the grievant with his vehicle, when the suspect had, in fact, actually hit him. Katrina Sterling states the grievant began firing "while maybe 10 feet away from me and my 18 month old son." The distance claimed in this statement is contradicted by the video evidence the City so strongly emphasizes, and does not speak to the direction the grievant fired.

Furthermore, the arbitrator credits the Union's assertion that the grievant has a right to cross-examine these witnesses. That opportunity was not provided.

Perhaps the largest point of contention is whether the grievant was justified in firing at Jones. The grievant claims he was in danger of being run over and possibly killed. The City claims the video demonstrates no such danger.

As noted by BCI,[24] "The speed of the incident is remarkable. The speed and complexity of rapidly evolving situation(s) that occur during use of force encounters are difficult concepts to comprehend by only watching the video." From the time the suspect's vehicle began moving forward, back into the parking spaces, until the grievant fired his weapon, was approximately 1.6 seconds.[25] While the arbitrator accepts this statement by BCI without reservation and readily acknowledges the difference between the grievant's experience and the act of calmly watching a video, frame-by-frame, after-the-fact, the undersigned is of the of the opinion that the grievant's actions are not those of someone who believes he may be hit by a vehicle.

[23] City Exhibit C-22
[24] City Exhibit C-21, p. 13
[25] U-19

23

The arbitrator is of the opinion that the typical reaction of a person confronted by a serious threat unexpectedly and suddenly is to recoil. The grievant makes no motion to separate himself from the proximity of the vehicle. Rather, he moves in the same direction as the vehicle before his first shot, and continues in this same direction, alongside the vehicle, as he fires the second shot.

There is no doubt a vehicle can be, and sometimes is, used as a weapon. It is undisputed that Jones ran over the grievant's foot. However, the vehicle was well on its way past the grievant when the shots were fired. Even had the suspect turned hard towards the grievant as the shots were fired, it is highly unlikely the grievant would have been hit by the vehicle. While it is acknowledged that law enforcement officers often have to make split-second decisions that may have life or death consequences for themselves and/or others, at the same time they are responsible for exercising restraint when circumstances warrant doing so.

Moving to the issue of the what the City relied upon in deciding to terminate the grievant, the Notice states "The basis for the City's allegations are (1) video and audio from the scene; (2) witness statements (including yours); (3) the Ohio BCI's investigative file (including photos, video, audio, interviews and reports); and (4) your prior disciplinary and PEWS history (for motive and credibility purposes only)."[26]

The termination letter itself states "…Chief Stillman confirmed the City reviewed its policies referred to in the Notice of Charges and Officer Rogers' pre-incident files (prehire training file, personnel file, PEWS file, reprimand file.)"

Chief Stillman was asked on direct examination "Does the city contend there's any basis for Officer Blake's termination other than a comparison of the witness statements given to the union, including Officer Blake's statements, and comparing those to the video and photos?" In response, he answered "No." This response appears to be contrary to the Notice and the termination letter, which may be considered contrary to each other. The Chief's response is certainly contrary to the amount of time the City spent, at hearing, reviewing the grievant's PEWS file and prior reprimand. These various renditions of what the City considered in arriving at its decision leave one wondering what, precisely, was taken into consideration.

---

[26] M-3, p. 2

Regarding Chief Stillman's memo to the mayor, which was not provided to the Union, the arbitrator notes that Chief Stillman testified credibly that the memo contained nothing that is not in the record here.

Another question that must be answered to establish just cause is whether the severity of the discipline was reasonably related to the infraction itself and in line with discipline that is usually administered, as well as to the seriousness of the employee's past record.

The arbitrator has already discussed the disparity in the discipline issued in the March incident as compared to that issued to the grievant. Regarding the grievant's past record, as noted above the Notice advised the grievant that part of the City's basis for the allegations against him were his "…prior disciplinary and PEWS history (for motive and credibility purposes only)." The Union argued in its post-hearing brief that, under Article 22 of the contract, the grievant's prior written reprimand[27] was expired and should not have been considered.

The reprimand was dated March 15, 2017. Article 22, Section 5 states

> The record of all disciplinary procedure shall be expunged from the officer's file:
>
> B.  After one (1) year if the disciplinary procedure resulted in a reprimand, or a loss of wages of not more than one (1) day, and more than one (1) year has passed without a second violation of the same or a similar offense.

As there is no evidence the grievant received another violation for an offense similar to that outlined in the written reprimand, that reprimand should have been expunged. A common meaning of "expunge" is to "erase or remove completely." In law, an expungement order directs a court to treat the criminal conviction as if it had never occurred, essentially removing it from a defendant's criminal record. Therefore, it is the arbitrator's opinion that the City should no longer have had a record of the written reprimand to rely upon for any reason.

The final element of just cause questions whether the disciplinary action was taken in a timely manner. There was no argument regarding this issue.

---

[27] City Exhibit C-12

In summary, although the arbitrator's opinion is that the grievant was not justified in using deadly force in this incident, the City did not prove the grievant violated all of the policies listed in the termination letter, and also made numerous due process errors: the grievant was given disparate treatment compared to officers involved in the March 1, 2019 incident; it assumed differing positions regarding whether the car was moving towards the grievant, depending upon whether it was prosecuting Jones or terminating the grievant; it did not prove the bystanders in the parking lot were in any danger of being struck by the grievant's shots; the grievant was not provided sufficient information to defend himself against the charge of being dishonest; and it considered discipline which, according to the contract, should have been expunged.

Given the number and seriousness of these errors, the City did not have just cause to terminate the grievant. He is to be reinstated to his position with full benefits as if he had not been terminated. Upon reinstatement his duty status vis-à-vis his injury will be such as though he had not been terminated. As for backpay, the City argued the grievant was unfit for duty during the period of termination, and that back pay for that period would therefore not be warranted. The City is to determine what light or limited duty the grievant would have been entitled to, if any, had the termination not been issued, and compensate him accordingly. That period of compensation is to begin with the first day of his termination and continue until he is reinstated in accordance with this decision. The arbitrator retains jurisdiction until the remedy is fully implemented.

The second grievance alleges the City violated the contract by releasing to a local news agency the grievant's Notice of Charges and Pre-Disciplinary Hearing prior to a final interdepartmental ruling and the service of that ruling on the grievant.

Article 22, Section 3 states

> When an employee is charged with or is under investigation for alleged violations of departmental rules and regulations, reasonable efforts consistent with applicable law shall be made to withhold publication of the employee's name and the extent of the disciplinary action taken or contemplated until such time as a final interdepartmental ruling has been made and served upon the employee, except where the employee is charged with a felony.

It is undisputed that the Notice was provided to a staff reporter of the Cleveland Jewish News on February 8, 2021, and that the grievant's termination letter was dated February 22, 2021.

26

The City claims the release of the Notice was within applicable law, citing Ohio's Public Records Act. This law is explained in the Ohio Attorney General's *Ohio Sunshine Laws Manual.* Page 1 of the manual states that when a public office "…receives a proper public records request, and unless part of all of a record is exempt from release, a public office must provide inspection of the requested records promptly…" The City notes that the Union bears the burden of proof in this grievance, and asserts that the burden has not been met.

While the Union does bear the burden of proof, the evidence constitutes a *prima facie* case, and the City must therefore demonstrate that it complied with the contract. The *Ohio Sunshine Laws Manual* sets a condition precedent for the City's obligation to release information, that condition being the receipt of a "proper public records request." Since record bears no evidence of such a request, the arbitrator finds that the City did violate Article 22, Section 3 when it provided the Notice to a news agency before the grievant was served with his termination letter.

The grievant's requested remedy, on February 23, 2021, was that the City cease and desist releasing such documents outside the bounds of Article 22. The City is ordered to cease and desist committing any such violations.

## CONCLUSION

The disciplinary grievance is sustained. The City did not prove all of the charges it cited in the termination letter. Additionally, the City committed due process errors in its response to the grievant's actions in the June 27, 2019 officer-involved shooting. Given the number and seriousness of these errors, the arbitrator finds the City did not have just cause to terminate the grievant, and orders the remedy indicated herein.

The non-disciplinary grievance is also sustained. The City violated Article 22, Section 3 of the Collective Bargaining Agreement when it released the grievant's Notice of Charges to a news agency, and is ordered to cease and desist such violations.

*Christopher L. Beebe*
Christopher L. Beebe, Arbitrator

27